**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ellis McHENRY, Defendant–Appellant.**

**No. 95–3638.**

United States Court of Appeals,
Sixth Circuit.

Argued April 4, 1996.

Decided Oct. 1, 1996.

Phillip J. Tripi (argued and briefed), Office of the U.S. Attorney, Cleveland, OH, for Plaintiff–Appellee.

Debra M. Hughes (argued), Federal Public Defender's Office, Donald Krosin (briefed), Cleveland, OH, for Defendant–Appellant.

Before: CONTIE, BATCHELDER, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which CONTIE, J., joined. BATCHELDER, J. (pp. 129–37), delivered a separate dissenting opinion.

MOORE, Circuit Judge.

This appeal presents us with another in a continuing series of challenges to Congress's authority, after *United States v. Lopez,* — U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), to enact criminal laws under the Commerce Clause. In this instance, the defendant challenges the federal carjacking statute, 18 U.S.C. § 2119, part of the Anti Car Theft Act of 1992. Because we believe § 2119 lies well within the scope of the commerce power, we affirm the judgment of the district court.

**I. BACKGROUND**

Defendant Ellis McHenry was convicted after a jury trial on three counts of carjacking, three counts of using or carrying a firearm in relation to a crime of violence, 18 U.S.C. § 924(c), and one count of possession of a firearm as an illegal alien, 18 U.S.C. § 922(g)(5). The carjacking convictions are the only ones at issue here. In a prior appeal, this court rejected McHenry's argument that punishment under both 18 U.S.C. § 2119 and § 924(c) violated double jeopardy. *See United States v. McHenry,* Nos. 93–3935, 93–4041, 1994 WL 560927 (6th Cir. Oct.11, 1994) (unpublished opinion). Before his resentencing, the Supreme Court decided *United States v. Lopez,* — U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and

McHenry now argues that this decision mandates dismissal of the carjacking counts, even though the district court was not swayed by this argument. There are no disputed facts in this case.[1]

## II. DISCUSSION

We begin by noting that the carjacking statute has already been upheld in this circuit as a valid exercise of Congress's commerce power. *See United States v. Johnson*, 22 F.3d 106, 108–09 (6th Cir.1994). However, *Johnson* predates *Lopez*, the first Supreme Court decision in nearly sixty years to invalidate congressional action solely on Commerce Clause grounds. Our narrow mission in the instant appeal, therefore, is to determine whether *Lopez* necessitates any alteration in *Johnson*'s conclusion. We join the numerous other circuits that have upheld the carjacking statute in light of *Lopez*. *See United States v. Coleman*, 78 F.3d 154, 160 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 230, —— L.Ed.2d —— (1996); *United States v. Hutchinson*, 75 F.3d 626, 627 (11th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 241, —— L.Ed.2d —— (1996); *United States v. Bishop*, 66 F.3d 569, 585 (3rd Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995); *United States v. Robinson*, 62 F.3d 234, 236 (8th Cir.1995); *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995); *United States v. Carolina*, 61 F.3d 917, 1995 WL 422862, *1–2 (10th Cir.1995) (unpublished opinion).

### A. *Instrumentalities of Interstate ·Commerce*

In *Lopez*, the Supreme Court held that the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A) (1988 ed. Supp. V), which criminalized possession of a firearm within 1,000 feet of a school, exceeded Congress's authority "[t]o regulate Commerce

with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. *See* —— U.S. at ——, 115 S.Ct. at 1626. In so holding, the Court first explained that § 922(q) was not an attempt by Congress to "regulate the use of the *channels* of interstate commerce" or "to regulate and protect the *instrumentalities* of interstate commerce," two areas indisputably situated within Congress's commerce power. *Id.* at —— – ——, 115 S.Ct. at 1629–30 (emphasis added). As a result, the statute would stand or fall based on the degree to which it satisfied a third category of permissible legislation: "regulation of an activity that *substantially affects* interstate commerce." *Id.* at ——, 115 S.Ct. at 1630 (emphasis added). According to the Court, the government had failed to demonstrate that the mere possession of guns in school zones, even viewed in the aggregate, produced the requisite substantial effect. *Id.* at ——, 115 S.Ct. at 1634.

The carjacking statute, by contrast, is explicitly designed to regulate and protect an "instrumentality" of interstate commerce, placing it within the second category of legitimate congressional action ("Category Two").[2] As both the Third and Ninth Circuits have recognized, "cars are themselves instrumentalities of commerce, which Congress may protect." *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir.1995); *accord United States v. Bishop*, 66 F.3d 569, 588–90 (3d Cir.) ("the quintessential instrumentalities of modern interstate commerce"), *cert. denied*, —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995).

In describing Congress's power over instrumentalities, "or persons or things in interstate commerce," the *Lopez* Court noted that regulation and protection are permissible "even though the threat may come only from intrastate activities." —— U.S. at ——,

---

1. For a fuller exposition, see the prior panel opinion, 1994 WL 560927, at *1.

2. At the time of McHenry's offenses, the statute stated: "Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—(1) be fined under this title or imprisoned

not more than 15 years, or both, (2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both." 18 U.S.C. § 2119 (1992). Since 1992, § 2119 has been amended in areas not relevant to this appeal. *See* 18 U.S.C. § 2119 (1994).

115 S.Ct. at 1629. The Court also clearly distinguished regulation under this category from "Category Three" regulation of intrastate activities "that substantially affect interstate commerce." *Id.* at ——, 115 S.Ct. at 1630. In other words, the Court set forth distinct yet overlapping categories of Congressional power, in which some regulable intrastate activities would undoubtedly involve instrumentalities of interstate commerce *and* have a substantial effect on interstate commerce, but some would only possess one characteristic or the other. Congress, according to the Court, was empowered to regulate either category of intrastate activity. Although it might seem anomalous for the Court to have allowed regulation of activities involving instrumentalities that, even in the aggregate, do not substantially affect interstate commerce, such a result is perfectly in keeping with the purposes underlying the Commerce Clause. Instrumentalities of interstate commerce—e.g., cars, trains, airplanes, *see Bishop,* 66 F.3d at 588—retain the *inherent potential* to affect commerce, unlike other objects of regulation. Thus, even if a particular activity involving an instrumentality might not, through repetition elsewhere, substantially affect interstate commerce during the moment of regulation, the activity still falls within Category Two because the object of regulation contains the unique capacity to affect commerce at some future point in time. In the case of carjackings, for instance, the inherent mobility of cars leads to a substantial likelihood that commerce will be affected—if not in the act of carjacking itself, then in subsequent use of the car by whoever eventually possesses it.

As a result, although it has been argued that congressional authority under Category Two should be limited to regulating cars and other instrumentalities "actually engaged in interstate commerce" or "integrally related to an interstate commerce network," *Bishop,* 66 F.3d at 597 (Becker, J., dissenting in part), such a rule seems inconsistent with *Lopez* 's own articulation of the commerce power. Indeed, the rule appears to make Congress's power under Category Two essentially identical to that which is already afforded under Category Three. In our view, once we determine that congressional

action has been directed toward regulating or protecting an "instrumentality" of interstate commerce—e.g., cars, trains, airplanes, ships—that is the end of the Category Two inquiry. The action is a valid exercise of the commerce power.

### B. *A Substantial Effect on Interstate Commerce*

Section 2119 may also be sustained under Category Three, if Congress had a rational basis for concluding that carjacking itself "substantially affects" interstate commerce. We believe that it did. The statute addresses "economic evils of an interstate nature," even though each instance of the evil activity may not necessarily cross state lines. *United States v. Oliver,* 60 F.3d 547, 550 (9th Cir.1995). As further recognized by the Third Circuit in *Bishop,* carjacking is itself an economic transaction, albeit a coercive one: "When a criminal points a gun at a victim and takes his or her car, the criminal has made an economic gain and the victim has suffered an undeniable and substantial loss. Replicated 15,000 or 20,000 times per year, the economic effects are indeed profound." 66 F.3d at 581.

Congress could rationally have believed that the forcible taking of cars, viewed in the aggregate, has a substantial effect on interstate commerce. Indeed, Congress conducted extensive investigations and made specific findings regarding the impact of the "auto theft problem." H.R.Rep. No. 851, 102d Cong., 2d Sess. 14–16 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2829, 2830–32. Congress found that carjacking constituted an increasingly prominent type of auto theft, and that auto theft as a whole had profound effects on national and international commerce. *Id.* According to the House Report, stolen cars represented "over 50% of the value of property lost to crime" in 1991, and auto theft "ha[d] become a very large and lucrative business" involving various illicit schemes: taking cars to "chop shops," where they are "dismantled and sold for replacement parts"; falsely retitling vehicles for resale under the apparent endorsement of another state; and sealing stolen cars in international shipping containers for export. *Id.* Indeed, because

carjacking involves dispossessing a victim of an item deemed by Congress to be a significant "investment," Congress could have made the reasonable determination that replacement costs alone were sufficient to justify regulation. Congress could have concluded that victims of carjacking will in many cases need to replace or repair their cars, and that carjacking consequently injects many of its victims back into the car-buying, car-leasing, or car-repair market. Such transactions clearly have a substantial effect on interstate commerce. As the House Judiciary Committee observed, "as much as 64% of an automobile owner's comprehensive insurance premium is attributable to theft claims," and carjacking contributes significantly to this total amount of loss: "In a single week last year in Detroit [1991], 74 cars were stolen in armed carjackings." *Id.*

This contrasts sharply with the mere possession of a gun in a school zone, which in *Lopez* was found to have "nothing to do with 'commerce' or any sort of economic enterprise." —— U.S. at ——–——, 115 S.Ct. at 1630–31. The carjacking statute was enacted as an integral part of a comprehensive act aimed at deterring auto theft. *See* Anti Car Theft Act of 1992, Pub.L. No. 102–519, 106 Stat. 3384 (1992). Not only did the act criminalize carjacking, it also:

> increased the fines and prison terms for importation and exportation of stolen vehicles (section 102) and interstate transportation or possession of such vehicles (section 103), ... criminalized the operation of chop shops for dismantling stolen vehicles (section 105)[,] ... provided grants for the development of local "anti car theft committees" (section[s] 130–133), mandated the development of a federal/state task force for addressing certain issues related to auto theft and fraud (section 140), developed a national system for combatting automobile title fraud (sections 201–04), expanded the coverage of federal law mandating the marking of automobile parts and requiring automobile repair shops to use the markings to avoid the use of stolen parts (sections 301–06), and mandated stricter Custom Service inspections in order to prevent exportation of stolen automobiles (section 401).

*Bishop,* 66 F.3d at 580. Moreover, Congress specifically found that local and state law enforcement efforts had proved inadequate in capturing auto thieves. *See* H.R.Rep. No. 851 at 15, 1992 U.S.C.C.A.N. at 2831–32. In short, there can be no doubt that Congress considered the "recent development" of carjacking to be part and parcel of an economic problem of national dimension. *Id.* There can be no doubt that a rational basis exists for finding carjacking to have a substantial effect on interstate commerce.

*Lopez* recognizes that determinations as to the extent of Congress's commerce power will often be "one of degree." —— U.S. at ——, 115 S.Ct. at 1633 (citation omitted); *id.* at ——, 115 S.Ct. at 1637 (Kennedy, J., concurring) (citation omitted). This is necessarily so when the inquiry focuses on whether a regulated intrastate activity "substantially affects," rather than merely "affects," interstate commerce. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1630. Although such formulations are not very precise, "in the nature of things they cannot be," *id.* at ——, 115 S.Ct. at 1634, and some Commerce Clause cases will undoubtedly present vexing questions that obligate a court "to draw lines, often close and difficult lines." *Id.* at ——, 115 S.Ct. at 1640 (Kennedy, J., concurring) (citation omitted). Fortunately, this is not one of those close cases. The statutory scheme and legislative history of § 2119 provide ample support for the concept that carjacking is an economic activity that, through repetition, substantially affects interstate commerce. *Id.* at ——, 115 S.Ct. at 1634.

Because we have determined from the outset that the carjacking statute is directed at regulating economic activity, we do not need to address the separate question of whether the statute's jurisdictional element also renders it constitutional as another species of Category Three regulation. *See United States v. Wall,* 92 F.3d 1444, 1450 (6th Cir. 1996) (absence of jurisdictional element not fatal to federal gambling statute); *United States v. Tucker,* 90 F.3d 1135, 1141 (6th Cir.1996) ("*Lopez* did not proclaim a general rule that all federal criminal statutes must include a jurisdictional element."); *cf. United*

*States v. Chesney,* 86 F.3d 564, 568–69 (6th Cir.1996) (focusing on sufficiency of firearm statute's jurisdictional element as basis for valid exercise of commerce power). As a regulation of economic activity, § 2119 withstands constitutional scrutiny even without a demonstration that each individual instance of such activity affects interstate commerce.[3]

### III.  CONCLUSION

We agree with the district court that the carjacking statute remains constitutional after *Lopez,* for two reasons: (1) the statute is designed to regulate and protect instrumentalities of interstate commerce; and (2) the statute regulates economic activity that Congress could rationally have concluded has a substantial effect on interstate commerce. We reaffirm our holding in *United States v. Johnson,* 22 F.3d 106, 108–09 (6th Cir.1994). We **AFFIRM** the district court.

BATCHELDER, Circuit Judge, dissenting.

The majority opinion begins its discussion by noting that in *United States v. Johnson,* 22 F.3d 106, 108–09 (6th Cir.1994), we upheld the federal carjacking statute at issue in this case, 18 U.S.C. § 2119, against constitutional challenge, holding that the statute was within Congress's Interstate Commerce Clause powers. Accordingly, the majority opinion embarks upon the "narrow mission" of determining whether *United States v. Lopez,* 514 U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), "necessitates any alteration in *Johnson*'s conclusion." Maj. Op. at 126. As I read the majority opinion, I find nothing "narrow" about its holdings. Because the opinion cannot be squared with either the structure of a federal government of limited and enumerated powers, *compare* U.S. CONST. art. I, § 8 *with id.* amend. X, or with *Lopez,* I respectfully dissent.

### I.  The Interstate Commerce Clause.

#### A.

We start with first principles. The Constitution creates a Federal Government of enumerated powers. See U.S. Const., Art. I, § 8. As James Madison wrote, "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Ibid.*

*Lopez,* 514 U.S. at ——, 115 S.Ct. at 1626.

The Constitution enumerates the powers of Congress in Article I, Section 8.

> This "checklist" begins, "The Congress shall have the Power To ...," and then sets forth eighteen clauses of discrete powers allocated to Congress. This affirmative grant of power has a negative corollary: those powers not listed in Article I, Section 8 do not belong to Congress. Had the drafters of the Constitution not intended Congress's powers to be limited, a discrete enumeration of powers would have been unnecessary.

*Michigan Protection & Advocacy Serv., Inc. v. Babin,* 799 F.Supp. 695, 728–29 (E.D.Mich. 1992) (footnote and citation omitted), *aff'd on other grounds,* 18 F.3d 337 (6th Cir.1994).

The authority of Congress is limited to those powers which the Constitution enumerates. *See McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 405, 4 L.Ed. 579 (1819), *quoted in Lopez,* 514 U.S. at ——, 115 S.Ct. at 1633; U.S. CONST. art. I, § 8; *id.* amend. X; *cf. Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 195,

---

**3.**  Although we do not reach this issue, we recognize in passing that the Third Circuit did so in *Bishop,* holding "that the jurisdictional element in section 2119 *independently refutes* appellants' arguments that the statute is constitutionally infirm." 66 F.3d at 588 (emphasis added).

6 L.Ed. 23 (1824) ("The enumeration presupposes something not enumerated"), *quoted in Lopez,* 514 U.S. at ——, ——, 115 S.Ct. at 1627, 1633. A government of limited and enumerated powers cannot permit its officials deferential authority to determine the extent of their *own* powers. As James Madison noted in FEDERALIST No. 51, "In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself." THE FEDERALIST No. 51, at 320 (James Madison) (Isaac Kramnick ed., 1987). As another of the framers put it, weakness "renders men unfit to be trusted with unlimited power." RUSSELL KIRK, THE CONSERVATIVE MIND 90 (7th ed. 1986) (quoting JOHN ADAMS, 6 WORKS 444–45). And it "is of the very essence of judicial duty" that the courts, and not the Congress, ultimately must determine what the extent of Congress's limited and enumerated powers is, because, as Chief Justice John Marshall observed, "To what purpose are powers limited, and to what purpose is that limitation committed to writing; if these limits may, at any time, be passed by those intended to be restrained?" *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176, 178, 2 L.Ed. 60 (1803).

### B.

In 1937, the Supreme Court expanded the interstate-commerce power but held that its scope

> must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.

*National Labor Relations Bd. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937), *quoted in*

*Lopez,* 514 U.S. at ——, 115 S.Ct. at 1628–29. *Jones & Laughlin,* and other more recent Supreme Court opinions, *see generally Lopez,* 514 U.S. at —— – ——, 115 S.Ct. at 1627–30, subject the Interstate Commerce Clause to outer limits. *Id.* at ——, 115 S.Ct. at 1628 (citing *Jones & Laughlin,* 301 U.S. at 37, 57 S.Ct. at 624; *United States v. Darby,* 312 U.S. 100, 119–20, 61 S.Ct. 451, 459–60, 85 L.Ed. 609 (1941); *Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 87, 87 L.Ed. 122 (1942)). These opinions delineate three broad categories of activity which Congress may regulate under its interstate-commerce authority. *Id.* at ——, 115 S.Ct. at 1629 (citing *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686; *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 276–77, 101 S.Ct. 2352, 2360–61, 69 L.Ed.2d 1 (1981)).

While Congress may conclude that it has authority under the Interstate Commerce Clause, that "does not necessarily make it so." *Hodel,* 452 U.S. at 311, 101 S.Ct. at 2391 (Rehnquist, J., concurring in judgment), *quoted in Lopez,* 514 U.S. at —— n. 2, 115 S.Ct. at 1629 n. 2.[1] It is the judiciary, rather than the Congress, that must ultimately determine whether Congress has the authority it seeks to invoke under the Interstate Commerce Clause, *see Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258 (1964) (Black, J., concurring), *quoted in Lopez,* 514 U.S. at —— n. 2, 115 S.Ct. at 1629 n. 2, properly defined. Like Congress, the judiciary must adhere to a proper understanding of the Constitution, *see, e.g., Lopez,* 514 U.S. at ——, 115 S.Ct. at 1639 (Kennedy, J., concurring) ("it is the obligation of all officers of the Government to respect the constitutional design" (citations omitted)), and the Constitution does not necessarily mean what any one court says it means at any one time. *See Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 491–92, 59 S.Ct. 595, 604, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring) ("the ultimate touchstone of constitutionality is the

---

1. *Lopez* did not quote the next sentence in the *Hodel* concurrence, which states, "Congress' findings must be supported by a 'rational basis' and are reviewable by the courts." *Hodel,* 452 U.S. at 311, 101 S.Ct. at 2391 (Rehnquist, J., concurring in judgment) (citing *Perez,* 402 U.S. at 157, 91 S.Ct. at 1363 (Stewart, J., dissenting)). This may not have been an oversight, given the Court's disinclination to apply this test. *Cf. Lopez,* 514 U.S. at ——, 115 S.Ct. at 1630–34.

Constitution itself and not what we have said about it").[2]

## C.

Whether it would be wise for the federal government to take a particular action is beyond the point if the federal government does not have the constitutional authority to act. *See, e.g., Seminole Tribe v. Florida*, 517 U.S. ——, ——, 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996) (inquiring whether Congress passed a statute pursuant to a constitutional provision granting Congress the power to act (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452–56, 96 S.Ct. 2666, 2669–71, 49 L.Ed.2d 614 (1976)); *Lopez*, 514 U.S. at ——, 115 S.Ct. at 1641 (Kennedy, J., concurring) ("While it is doubtful that any State, or indeed any reasonable person, would argue that it is wise policy to allow students to carry guns on school premises, considerable disagreement exists about how best to accomplish that goal. In this circumstance, the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." (citing *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 49–50, 93 S.Ct. 1278, 1304–05, 36 L.Ed.2d 16 (1973); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 386–87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting))); *Hodel*, 452 U.S. at 311 n. *, 101 S.Ct. at 2391 n. * (Rehnquist, J., concurring in judgment). As the Supreme Court has long recognized,

Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power. The Constitution established a national government with powers deemed to be adequate, as they have proved to be both in war and peace, but these powers of the national government are limited by the constitutional grants. Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary. Such assertions of extra-constitutional authority were anticipated and precluded by the explicit terms of the Tenth Amendment—"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 528–29, 55 S.Ct. 837, 842–43, 79 L.Ed. 1570 (1935) (footnote omitted) (citing *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120, 121, 18 L.Ed. 281 (1866); *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413 (1934)).

While there is no question that Congress's constitutional exercise of its authority under the Interstate Commerce Clause does not violate the Tenth Amendment, *see, e.g., Hodel*, 452 U.S. at 291–92, 101 S.Ct. at 2368, that principle says nothing about what Congress's authority under that clause *is*.[3]

---

2. *Compare, e.g.,* U.S. CONST. amend. XIV, § 1 (forbidding states from denying persons within their jurisdictions the equal protection of the laws) *with Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (allowing race-based assignments of travelers to public accommodations), *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (prohibiting race-based assignments of pupils to schools), *Davis v. Board of School Comm'rs*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971) (mandating race-based assignments of pupils to schools), *and Missouri v. Jenkins*, 515 U.S. ——, ——, 115 S.Ct. 2038, 2061–73, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring) (criticizing previous opinions—including the reasoning but not the result of *Brown*—which led to race-based assignments of pupils to schools).

3. Similarly, the *Gibbons* statement that the interstate-commerce power,

like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution.... If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States[,]

22 U.S. (9 Wheat.) at 196–97, 6 L.Ed. 23, by itself says nothing about what the limits on the interstate-commerce power are.

The authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce "among the several States" and the internal concerns of a State. That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system.

*Jones & Laughlin,* 301 U.S. at 30, 57 S.Ct. at 621 (citing *Schechter Poultry,* 295 U.S. at 549, 550, 554, 55 S.Ct. 837, 851, 853, 79 L.Ed. 1570), *cited in Lopez,* 514 U.S. at ——, 115 S.Ct. at 1634. That is the issue before us today.

### D.

The majority upholds the federal carjacking statute at issue in this case, 18 U.S.C. § 2119, under two of the three *Lopez* categories, *see* 514 U.S. at —— – ——, 115 S.Ct. at 1629–30, of Congress's power to regulate commerce "among the several States." U.S. CONST. art. I, § 8, cl. 3. First, the majority rules that § 2119 is a permissible regulation of the instrumentalities of commerce. Second, the majority holds that the statute is a valid exercise of an intrastate activity that has a substantial effect upon interstate commerce. I address each aspect of the majority's opinion in turn.

### II. Instrumentalities of Interstate Commerce.

The majority opinion begins by reiterating the indisputable fact that Congress may regulate and protect the instrumentalities of interstate commerce. *See* Maj. Op. at 126 (quoting *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1629–30).[4] The majority then says that the "carjacking statute ... is explicitly designed to regulate and protect an 'instrumentality' of interstate commerce," and continues, "As both the Third and the Ninth Circuits have recognized, 'cars are themselves instrumen-

talities of commerce, which Congress may protect.'" *Id.* at 126–27 (quoting *United States v. Oliver,* 60 F.3d 547, 550 (9th Cir. 1995), and citing *United States v. Bishop,* 66 F.3d 569, 588–90 (3d Cir.1995)). Explaining that cars, like trains and airplanes,[5] are instrumentalities of interstate commerce, because, unlike other objects of regulation, they "retain the *inherent potential* to affect commerce," the majority concludes that:

> [E]ven if a particular activity involving an instrumentality might not, through repetition elsewhere, substantially affect interstate commerce during the moment of regulation, the activity still falls within [Congress's power to regulate and protect the instrumentalities of interstate commerce] because the object of regulation contains the unique capacity to affect commerce at some future point in time. In the case of carjackings, for instance, the inherent mobility of cars leads to a substantial likelihood that commerce will be affected—if not in the act of carjacking itself, then in subsequent use of the car by whoever eventually possesses it.

*Id.* at 127. This conclusion is wholly unsupported by any authority and far afield from the "narrow mission" the majority promises to undertake.

The notion that cars are "instrumentalities" of interstate commerce, and therefore, regulable under Congress's Interstate Commerce Clause authority, has a certain appeal, since cars can be used for commercial purposes. It does not follow, however, that, because cars have the *"inherent potential* to affect commerce," *id.,* they *are,* without exception, "instrumentalities" of interstate commerce, and that federal statutes designed to regulate or protect them are within Congress's power to regulate commerce among the several states.

First, many things, and for that matter, most people, "retain the *inherent potential* to

---

4. Congressional regulation of an instrumentality is valid even if the threat comes from purely intrastate activity. *See Lopez,* 514 U.S. at ——, 115 S.Ct. at 1629 (citing *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); *Southern R. Co. v. United States,* 222 U.S. 20, 32

S.Ct. 2, 56 L.Ed. 72 (1911); *Perez,* 402 U.S. at 150, 91 S.Ct. at 1359).

5. I am aware of no case in which the Supreme Court has held that trains and airplanes are always instrumentalities of interstate commerce.

affect commerce."[6] But this alone cannot suffice to give Congress the power to regulate or protect them. *See* U.S. Const. art. I, § 8, cl. 3; *Lopez*, 514 U.S. at ——, 115 S.Ct. at 1629 (citations omitted). Second, if regulations "designed" to protect things having the inherent potential to affect interstate commerce are presumptively valid under the Interstate Commerce Clause, then a congressional regulation requiring homeowners to padlock their garages whenever a car is parked inside would withstand constitutional scrutiny. So, too, would federal criminalization of simple car theft or turnstile-jumping in a municipality's rapid-transit system. The notion that the federal government could legitimately enact such statutes under its interstate-commerce powers is troubling, to say the least. But these few examples provide, I think, an insight into the third flaw in the majority's view of Congress's interstate-commerce powers.

Although cars *can be* the instrumentalities of interstate commerce, the federal carjacking statute does not regulate or otherwise protect cars *as* instrumentalities of interstate commerce. Instead, § 2119 criminalizes carjacking regardless of whether a car that is or has been carjacked was at that time functioning as an instrumentality of interstate commerce. As Judge Becker has well observed:

> The fact that automobiles can be used as instrumentalities of interstate commerce does not grant to Congress plenary authority to regulate the use and operation of every individual's automobile. Such an approach would constitute a dramatic encroachment on the regulation of automobiles, a traditional area of state concern, and would permit Congress to pass federal laws requiring individuals to wear seatbelts (as opposed to requiring that cars be manufactured with seatbelts) or banning

motorists from making a right turn at a red light.

*Bishop*, 66 F.3d at 599 (Becker, J., concurring in part and dissenting in part).

The majority disagrees that Congress has the authority to make carjacking illegal only in those instances in which the carjacked car was "actually engaged in interstate commerce[,]"[7] opining, without explanation, that such a view "seems inconsistent with *Lopez*'s own articulation of the commerce power." The majority observes further that a rule making carjacking a federal offense only where a car was "actually engaged in interstate commerce" "appears to make Congress's power [to regulate or protect the instrumentalities of interstate commerce] essentially identical to that which is already afforded under [Congress's power to regulate an activity that substantially affects interstate commerce]." Maj. Op. at 127. The logic of this is not clear, but even if a rule permitting Congress to regulate or to protect instrumentalities of interstate commerce *as* instrumentalities of interstate commerce did have the effect of making Congress's "instrumentalities" power "essentially identical" to its "substantially affects" power, that is no reason to reject the rule.

Because § 2119 does not regulate or otherwise protect cars as instrumentalities of interstate commerce, but protects cars *as cars*, the majority, in order to uphold the statute, effectively expands the definition of an "instrumentality" of interstate commerce to include all cars. In other words, the majority extends Congress's power to regulate things when they are instrumentalities of interstate commerce into the power to regulate such things under all circumstances. Following this approach, the question of whether a car was an instrumentality of interstate com-

---

6. And people, like cars, are "mobile" and have "the unique capacity to affect commerce at some future point in time."

7. The majority opinion also quotes Judge Becker to the effect that Congress may regulate objects which are "integrally related to an interstate commerce network...." Maj. Op. at 5 (quoting *Bishop*, 66 F.3d at 597 (Becker, J., concurring in part and dissenting in part)). Judge Becker was speaking, of course, about "objects such as railcars or railway bridges, which are integrally re-

lated to an interstate commerce network[,]" *Bishop*, 66 F.3d at 597 (Becker, J., concurring in part and dissenting in part), and although I suppose that there might be instances in which cars could be "objects ... integrally related to an interstate commerce network[,]" there is nothing to indicate that, in enacting § 2119, Congress sought to prohibit carjacking of cars because they are "integrally related to an interstate commerce network" of one form or another.

merce when it was carjacked is not relevant. However, the Supreme Court's line of cases that identifies the regulation of instrumentalities of (and persons and things in) interstate commerce as one of the broad categories of activity that Congress may regulate under its interstate-commerce power renders this a question that we cannot contrive to avoid.

In enacting § 2119, Congress may well have assumed it has authority under the Interstate Commerce Clause to criminalize any carjacking, regardless of how the car is used. But we cannot resolve this case by blindly deferring to Congress's judgment. We have an independent duty to measure Congress's judgment against the constitutional source of Congress's authority to act. *See Marbury*, 5 U.S. (1 Cranch) at 177. Doing so in this case requires that § 2119 be declared beyond Congress's authority to regulate or protect the instrumentalities of in-

terstate commerce. I reject the majority's conclusions in this regard, for there is nothing in § 2119, its legislative history, or in the majority opinion that persuades me that the federal carjacking statute was either intended or designed to, or in fact does, regulate or protect cars *as* the instrumentalities of interstate commerce.

### III. Activities Substantially Affecting Interstate Commerce.

The majority opinion's second ground for concluding that § 2119 is a valid exercise of Congress's interstate-commerce powers is that Congress had a rational basis [8] for concluding that § 2119 regulates an activity, carjacking, which, albeit intrastate, has a substantial effect on interstate commerce, when taken in the aggregate. *See* Maj. Op. at 127–28.[9] Therefore, the majority reasons, it must

**8.** The "rational-basis" test has frequently *deferred* to the findings of Congress, *see, e.g., Lopez*, 514 U.S. at ——, 115 S.Ct. at 1658 (Breyer, J., dissenting) (citing *Hodel*, 452 U.S. at 276–77, 101 S.Ct. at .2360–61); *id.* at ——–——, ——, 115 S.Ct. at 1651–52, 1653 (Souter, J., dissenting) (citations omitted), but the word "rational" appears only once in the *Lopez* opinion. Even then, it is in *dicta* regarding the history of the Interstate Commerce Clause in which the Court recalled that it had "heeded" the "warning" of *Jones & Laughlin* to consider the Interstate Commerce Clause "in the light of our dual system of government" and not extend it to *indirect and remote* effects on interstate commerce. *See id.* at ——–——, 115 S.Ct. at 1628–29 (citing *Jones & Laughlin*, 301 U.S. at 37, 57 S.Ct. at 624; *Darby*, 312 U.S. at 119–20, 61 S.Ct. at 459–60; *Wickard*, 317 U.S. at 125, 63 S.Ct. at 89; *Hodel*, 452 U.S. at 276–80, 101 S.Ct. at 2360–61; *Perez*, 402 U.S. at 155–56, 91 S.Ct. at 1362; *Katzenbach v. McClung*, 379 U.S. 294, 299–301, 85 S.Ct. 377, 381–82, .13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel*, 379 U.S. at 252–53, 85 S.Ct. at 354–55). The Court's only reference to the rational-basis test is in a paragraph which (1) could further .*limit* the interstate-commerce power of Congress, and (2) re-articulates not the "substantial-effects" test but the former "direct-indirect effects" test. Thus, by citing precedent which expanded the interstate-commerce power, *see id.; cf. id.* at ——, 115 S.Ct. at 1654 (Souter, J., dissenting) (The Court's "distinction between what is patently commercial and what is not looks much like the old distinction between what directly affects commerce and what touches it only indirectly."), the Court perhaps signals a return to an historical understanding of the Interstate Commerce Clause.

**9.** Under the aggregation/class-of-activities analysis, one question for a court has been whether the class Congress sought to regulate was "within the reach of the federal power." *Maryland v. Wirtz*, 392 U.S. 183, 192, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968) (quoting *Darby*, 312 U.S. at 120–21, 61 S.Ct. at 460–61), *overruled on other grounds, National League of Cities v. Usery*, 426 U.S. 833, 855, 96 S.Ct. 2465, 2476, 49 L.Ed.2d 245 (1976), *overruled on other grounds, Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 557, 105 S.Ct. 1005, 1021, 83 L.Ed.2d 1016 (1985). While courts have had no power to excise as trivial individual instances in a rationally defined class of activities, *id.* (citing *Wickard*, 317 U.S. at 127–28, 63 S.Ct. at 90–91; *Polish Nat'l Alliance v. National Labor Relations Bd.*, 322 U.S. 643, 648, 64 S.Ct. 1196, 1199, 88 L.Ed. 1509 (1944); *McClung*, 379 U.S. at 301, 85 S.Ct. at 382), *cited in Lopez*, 514 U.S. at ——, 115 S.Ct. at 1650 (Thomas, J., concurring), *and Perez*, 402 U.S. at 154, 91 S.Ct. at 1361, this does not mean that "Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities." *Id.* at 196 n. 27, 88 S.Ct. at 2024 n. 27. It may not. *See id.* "The Court has said only that where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Id.*

While the aggregation/class-of-activities analysis remains, we do know that the interstate-commerce power is limited, in addition to the ways already discussed, *at least* to this extent: The class of activities must be within the reach of the federal power, and the class must be rationally defined. *See id.* at 192, 88 S.Ct. at 2022 (citations omitted).

be sustained against McHenry's constitutional attack. I disagree.

To begin with, the majority gives scant serious scrutiny to the rationales it offers in support of § 2119. After rehearsing the costs of carjacking and auto theft, the majority gives its imprimatur to Congress's finding "that carjacking constituted an increasingly prominent type of auto theft, and that auto theft as a whole had profound effects on national and international commerce." *Id.* at 6 (citation omitted).

In *Lopez,* the Supreme Court held that a similar costs-of-crime rationale supporting the prohibition on possession of firearms in school zones was an inadequate justification for regulating that sort of firearms possession. 514 U.S. at ——, 115 S.Ct. at 1632. The reason was that this rationale simply proved too much. Under this rationale, it was difficult to perceive any limit on federal power, even in areas where states have traditionally been sovereign. *Id.* The Court declined even to consider the "serious problem" and the "substantial threat to trade and commerce" which the regulated activity may pose. *Id.* at ——, 115 S.Ct. at 1633. In the case *sub judice,* however, the majority disregards this aspect of *Lopez,* and sustains the carjacking statute on what can only be a costs-of-crime-rationale. After *Lopez,* this will not do.

In an interesting passage of its opinion, the majority bolsters its conclusion by theorizing that:

[B]ecause carjacking involves dispossessing a victim of an item deemed by Congress to be a significant "investment,"

Congress could have made the reasonable determination that replacement costs alone were sufficient to justify regulation. Congress could have concluded that victims of carjacking will in many cases need to replace or repair their cars, and that carjacking consequently injects many of its victims back into the car-buying, car-leasing, or car-repair market. Such transactions have a substantial effect on interstate commerce.

Maj. Op. at 128. If such an approach amply justifies a federal law criminalizing carjacking, it follows that it would also support making any automobile theft a federal crime. It would even support making the theft, more generally, of other "significant investments," federal crimes. Surely, stereos and compact-disk players, personal computers and "dry goods," such as refrigerators, microwaves, and washers and dryers, are "significant investments." Would the theft of these items similarly be within the scope of Congress's authority to criminalize under the Interstate Commerce Clause? As I read the majority opinion, they would be.

These questions are not merely rhetorical. Under our federal system of government, the "States possess primary authority for defining and enforcing the criminal law." *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982); *see also Lopez,* 514 U.S. at —— n. 6, 115 S.Ct. at 1648 n. 6 (Thomas, J., concurring). The majority's reminder that "Congress specifically found that local and state law enforcement efforts had proved inadequate in capturing auto thieves[,]" Maj. Op. at 128 (citation omitted),

Aggregation has raised concerns, because "one *always* can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce." *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1650 (Thomas, J., concurring). Thus, the renewed recognition that the Interstate Commerce Clause has outer limits, *id.* at ——, 115 S.Ct. at 1628 (citing *Jones & Laughlin,* 301 U.S. at 37, 57 S.Ct. at 624; *Darby,* 312 U.S. at 119–20, 61 S.Ct. at 459–60; *Wickard,* 317 U.S. at 125, 63 S.Ct. at 89); *see generally Gibbons,* 22 U.S. (9 Wheat.) at 194–96, *quoted in Lopez,* 514 U.S. at ——, 115 S.Ct. at 1627, may return us to former conclusions with which more recent departures dealing with aggregation and classes of activities conflict. For example, the days of believing that Congress

has an interstate-commerce power never yet exceeded, *Wickard,* 317 U.S. at 120, 63 S.Ct. at 87 (citing *Gibbons,* 22 U.S. (9 Wheat.) at 194, 195); *see Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 20, 109 S.Ct. 2273, 2284, 105 L.Ed.2d 1 (1989) (citations omitted), *overruled by Seminole Tribe,* 517 U.S. at ——, 116 S.Ct. at 1128, a notion practically irreconcilable with a federal government of limited and enumerated powers, have passed. Although *Seminole Tribe* did not mention this notion in overruling *Union Gas,* it was one of the building blocks *Union Gas* used for the holding that *Seminole Tribe* knocked down. *Compare Union Gas,* 491 U.S. at 19–24, 109 S.Ct. at 2284–86, *with Seminole Tribe,* 517 U.S. at ——–——, 116 S.Ct. at 1125–28.

provides no basis for upholding this encroachment upon the plenary police power of the States.[10] The *Lopez* Court underscored the principle that federal efforts to occupy an area of the criminal law, where the States have already entered the field, "effects a change in the sensitive relation between federal and state criminal jurisdiction." 514 U.S. at ――― n. 3, 115 S.Ct. at 1631 n. 3 (citation and internal quotation marks omitted). *Lopez* also reaffirms that Congress has no plenary police power authorizing every type of legislation. *Id.* at ―――, 115 S.Ct. at 1633 (citing U.S. CONST. art. I, § 8); *cf. id.* at ―――, 115 S.Ct. at 1642 (Thomas, J., concurring) ("we *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; ... the Federal Government has nothing approaching a police power" (citing *New York v. United States,* 505 U.S. 144, 154, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992); *Wirtz,* 392 U.S. at 196, 88 S.Ct. at 2023–24; *Jones & Laughlin,* 301 U.S. at 37, 57 S.Ct. at 624; *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 435, 1 L.Ed. 440 (1793) (Iredell, J.))). If federalism means anything, it means that the federal government has nothing approaching a *carte blanche.* Today's majority opinion pays no heed to these concerns of federalism, and I therefore, cannot agree that its result squares with *Lopez.* But there are additional reasons I must dissent.

10. Whatever its accuracy with regard to "auto thieves" in general, the facts of this case at least call into question the accuracy of Congress's finding as it relates to carjackings. Officers with the Cleveland Police Department—not the "feds"—arrested McHenry for the three carjackings he committed. *See United States v. McHenry,* Nos. 93–3935, 93–4041, 1994 WL 560927, at *1 (6th Cir. Oct.11, 1994).

11. Any doubt about the existence of this restriction is put to rest by the Supreme Court's repeated use of these terms, *see, e.g., Lopez,* 514 U.S. at ―――, 115 S.Ct. at 1630 ("First, we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce."); *id.* ("Where economic activity substantially affects interstate commerce, ....."); *id.* ("Even *Wickard* ... involved economic activity...."); *id.* at ――― ―――, 115 S.Ct. at 1630–31 ("Section 922(q) ... has nothing to do with 'commerce' or any sort of economic enterprise...."), and by the Interstate

As I have explained elsewhere, *see United States v. Chesney,* 86 F.3d 564, 575–76 (6th Cir.1996) (Batchelder, J., concurring in the result), the question of whether an intrastate activity, such as carjacking, has a substantial effect on interstate commerce becomes relevant to the inquiry of whether a congressional regulation of such activity is a valid exercise of Congress's interstate-commerce powers only *after* it has once been determined that the activity is commercial or economic,[11] or that the statute in question is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* 514 U.S. at ―――, 115 S.Ct. at 1631. Though the majority holds that carjacking itself is commercial activity and that the statute criminalizing it is "an integral part of a comprehensive act aimed at deterring auto theft," which I presume the majority believes to be a regulation of "economic activity," too, I do not find the majority's reasoning persuasive.

The only rationale that I can perceive in the majority opinion to justify the conclusion that carjacking is commercial or economic activity, is that the cost of this particular form of crime has an effect on interstate commerce. But the fact that criminal activity has an economic or social cost does not make that activity "commercial" or "economic."[12] If it did, *Lopez* could not have con-

Commerce Clause itself. *See, e.g., id.* at ――― n. 9, 115 S.Ct. at 1650 n. 9 (Thomas, J., concurring) ("' "commercial" character' is not only a natural but an inevitable ground for Interstate *Commerce* Clause distinction" (quoting *id.* at ―――, 115 S.Ct. at 1654 (Souter, J., dissenting))).

12. I do not necessarily embrace Judge Becker's view that, because it is not consensual, carjacking is not "commercial activity." *See Bishop,* 66 F.3d at 602 (Becker, J., concurring in part and dissenting in part). However, as the *Lopez* Court pointed out, "commerce" has been defined in terms of "intercourse" since *Gibbons,* 22 U.S. (9 Wheat.) at 189–90. *Lopez,* 514 U.S. at ―――, 115 S.Ct. at 1626–27. Virtually every definition of "intercourse" (except one which defines "intercourse" as "commerce," BLACK's LAW DICTIONARY 811 (6th ed. 1990)) involves the notion of "exchange," *i.e.,* the trading, bartering or swapping of one thing for something of roughly equivalent value. One dictionary defines "intercourse" as "communication or dealings between or among

cluded that possession of a firearm in a school zone was not commercial or economic activity subject to Congress's interstate-commerce power. *See id.* at ——— ———, 115 S.Ct. at 1630–31.[13]

Because carjacking is not commercial or economic activity, *see Bishop,* 66 F.3d at 602 (Becker, J., concurring in part and dissenting in part), and the carjacking statute is not an essential part of a larger regulation of economic activity, *see id.* at 602–03 (Becker, J., concurring in part and dissenting in part), I would hold that the federal carjacking statute does not survive *Lopez.*[14]

people, countries, etc.; interchange of products, services, ideas, feelings, etc." and "interchange" as "to give and take mutually; exchange ... to put (each of two things) in the other's place...." WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 733, 734 (2d ed. 1972); *see also Lopez,* 514 U.S. at ——— ———, 115 S.Ct. at 1643–44 (Thomas, J., concurring). Few would argue, I suppose, that carjacking involves any kind of exchange.

Similarly, "economics" is generally defined as "the science that deals with the production, distribution, and consumption of wealth, and with the various related problems of labor, finance, taxation, etc.;" and "economic" as "of or having to do with the management of the income, expenditures, etc. of a household, private business, community, or government ... of or having to do with the production distribution, and consumption of wealth ... of or having to do with economics...." WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 442. The fact that criminal activity has economic costs does not elevate the criminal activity into economic activity.

**13.** Even if carjacking were "commercial" or "economic" activity, that would not necessarily

mean § 2119 is a valid exercise of Congress's authority to regulate commercial or economic activities substantially affecting interstate commerce. *See United States v. Wall,* 92 F.3d 1444, 1464 (6th Cir.1996) (Boggs, J., concurring in part and dissenting in part) (noting that *Lopez* "could not have intended to imply that all commercial activities could be regulated" (citation omitted)); *see also Lopez,* 514 U.S. at ——, 115 S.Ct. at 1633.

**14.** In addition, the intimation in the majority opinion that the presence of a jurisdictional element in the federal carjacking statute bespeaks its constitutionality, *see* Maj. Op. at 129 n. 3 (citation omitted), is misplaced. The mere presence of a jurisdictional element in § 2119 cannot render it a constitutional exercise of Congress's authority to regulate activities substantially affecting interstate commerce where there is no sustainable argument that the activities are themselves "commercial" or "economic" or that the statute is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *See Chesney,* 86 F.3d at 575–76, 579–81 (Batchelder, J., concurring in the result).