*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0108p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 02-5865

TIMOTHY CHAMBERS,

*Defendant- Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 00-00015—Karl S. Forester, District Judge.

Submitted: March 15, 2006

Decided and Filed: March 23, 2006

Before: MARTIN and CLAY, Circuit Judges, SARGUS, District Judge.[*]

---

**COUNSEL**

**ON BRIEF:** Kevin M. Schad, SCHAD & SCHAD, Lebanon, Ohio, for Appellant. Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, Laura K. Voorhees, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, for Appellee.

---

**OPINION**

---

BOYCE F. MARTIN, JR., Circuit Judge. The defendant, Timothy Chambers, was indicted on ten counts of transportation of child pornography via computer in violation of 18 U.S.C. § 2252(a)(1), one count of transporting a minor across state lines for the purpose of criminal sexual activity in violation of 18 U.S.C. § 2423(a), and one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(b). Chambers pled not guilty and proceeded to trial, whereupon he was convicted on all counts. Chambers was then sentenced to life imprisonment. On appeal, Chambers argues that: (1) the district court abused its discretion when it denied Chambers's motion for new counsel; (2) the district court erred when it determined that Chambers voluntarily waived his right to testify on his own behalf; (3) there was insufficient evidence to convict him; (4) various evidence was improperly admitted against him; (5) that his sentence was improperly imposed and that he is entitled to resentencing pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and

---

[*] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

*United States v. Oliver*, 397 F.3d 369 (6th Cir. 2005). The government concedes that Chambers is entitled to resentencing. For the reasons that follow, we AFFIRM Chambers's convictions, but VACATE his sentence and REMAND for resentencing.

## I.

On November 24, 1999, Ashland, Kentucky police officers executed a warrant on Chambers's apartment and found four picture albums containing photographs of nude males, including sixteen Polaroid photographs of child pornography. Twelve of the pictures were dated "9-23-94" and depicted a then-thirteen year old male (Jonathan E.) exposing himself. Two other pictures depicted Chambers and Jonathan E. engaging in oral sex. The other pictures included images of a minor male's genitalia, Chambers performing oral sex on a male (labeled with the minor's name and age of 17), two nude pictures of Jonathan E.'s brother, Michael E., exposing himself (labeled with Michael E.'s name and age of 15), and two nude images of Chambers exposing himself.

Jonathan E. was eleven or twelve when he and Chambers met, and Chambers sometimes served as Jonathan E.'s babysitter. By the time Jonathan E. was thirteen, Chambers had begun having sex with him. Chambers also filmed himself having intercourse with Jonathan E. and Michael E, and of them posing nude.

During November/December 1998, Chambers had telephone and internet service with GTE, and his internet user ID, which he opened on August 26, 1998 and maintained through May 23, 2003, was TRC69. Chambers also had WebTV, which provides access to the internet without the use of a computer. WebTV can be used to play videos and convert snapshots of video frames into JPEG picture files which can be attached to emails and posted and transmitted over the internet. The TRC69 internet account was billed to "TC" at a P.O. box in Ashland, Kentucky. Chambers was listed as the primary user on the internet account. On November 11, 1998, Chambers created the user name Kewldude3 for the account. WebTV's services are located in Mountain View, California, and internet transmissions originating in Ashland, Kentucky, are processed by servers in California.

Pantellic Software is a company in Halifax, Nova Scotia, and its website is www.photopoint.com, which allows individuals to email photos to the company where they are processed and posted in personal web pages to be shared with family and friends. The company's servers are located in Canada. Between November 26-30, 1998, Dale Gass, the part-owner of Pantellic, received and reviewed email submissions from trc69@webtv.net and kewldude3@webtv.net. Gass discovered what he believed to be pornographic images of children in these emails and he gave a compact disc with copies of the emails to Halifax Regional Police Officer Anthony Casella. These emailed images included a nude Polariod of Jonathan E. or Michael E. It was determined that these imagines were captured from a WebTV video camera and were sent directly from the WebTV associated with the kewldude3 account.

A different male minor, EJ C., lived with his mother and three siblings and met Chambers when he was thirteen years old. The night they met, Chambers drove EJ C. and another person to Portsmouth, Ohio. When Chambers was alone with EJ C., Chambers told EJ that he was bisexual and that he "hustled" himself and other people. Chambers also showed EJ his gun and allowed him to hold it.

Following that evening, Chambers took an interest in EJ and his family, including EJ's mother Michelle. Chambers occasionally took the family to the mall, park, or out to eat, and would sometimes spend the night at the family's apartment. On one occasion, Chambers showed Michelle a website that displayed pictures of persons having sex with the deceased, including male minors. When Chambers would visit, he would take pictures of the children on his "Digicam," and he

showed Michelle nude pictures of himself taken on the Digicam.  Michelle nevertheless trusted Chambers to be alone with her children.

When Chambers was alone with EJ, Chambers often talked about sex.  EJ testified that Chambers encouraged EJ to "hustle" for him, which EJ construed as sleeping with Chambers and others in exchange for money.  EJ told Chambers he was not interested.  Chambers also took EJ back to his own apartment in Ashland and showed EJ videos that Chambers said he had taken of minors and adults having sex.  One day Chambers drove EJ from his family's apartment to Mike Strickland's residence in Portsmouth, Ohio.  When Strickland left the residence, Chambers displayed his gun and told EJ that he would kill him and/or his family if EJ did not have sex with him.  EJ then undressed and Chambers performed oral sex on him.  Another individual, Nick Wright, unexpectedly entered the room and witnessed the act, whereupon Wright yelled at Chambers and told him to leave the home.  Chambers then drove EJ home.

Michelle testified that EJ's behavior then changed and EJ would refuse to spend time with Chambers.  EJ then confided in his mother, and Michelle called the police.  EJ told the police that Chambers had sexually assaulted him on several occasions, and the police arrested Chambers.  Chambers was advised of his rights and, after signing a waiver, gave a written statement and consented to a search of his car.  In the car, the police found a receipt for Chambers's gun and ammunition, notes with Strickland's phone numbers, Michelle's phone numbers and the names and birth dates of her four children, including EJ, and a spiral notebook that appeared to be a journal.  One of the journal pages contained eleven entries detailing graphic descriptions of sexual contacts with Jonathan E.  Also found were two 35-millimeter cameras, one digital camera, videotapes, K-Y Jelly, and Vaseline.

Chambers's written confession stated that

I have taken pictures of guy[s] that were between 16 and 23 years of age or older. I put some of them on the net for others to view. . . . I am so sorry for my actions, but, again, I never knew that I was doing anything wrong. . . . Some might have been under the age of 18, but no less than 15, and, of course, some I didn't know their age other than what they told me, which were from 18 and up to?.  I have accessed some site with underage persons, but, again, not less than 14/15.  I did this out of curiosity. Names of who I recall having pics of that are not younger than 14 but that can be considered underage: Jonathan E[], 14; Michael E[], 15/16; Mike M[],[1] 15/16.  The following was a volunteered statement to the FBI, and I will add more as I can think of them.

Chambers also admitted that trc69@webtv.net was one of his user names.

The indictment alleged that Chambers took various Polaroid and video pictures of male minors between the ages of twelve and sixteen in various stages of undress and engaging in sexual contact with Chambers and others.  The indictment further alleged that Chambers sent ten of the pictures or images to Pantellic's website in Nova Scotia, for placement in the public domain.  Also alleged by the government was that Chambers took EJ from his home in Kentucky into Ohio to engage in oral sex with EJ, who was under sixteen years of age.  Finally, the indictment alleged that Chambers possessed Polaroid pictures of himself and male minors under the age of sixteen upon his arrest.  The indictment was returned on November 16, 2000.

---

[1]Michael E. introduced Mike M. to Chambers in the early 1990s and Chambers made sexual advances toward Mike M. when Mike M. was fourteen or fifteen years old.  Chambers invited Mike M. to his apartment for "sexual favors" and performed sexual acts on Mike M. and also took nude pictures of him.  Chambers told Mike M. that he was planning to set up a WebTV site and that he wanted to sell nude photos of Mike M.

On February 13, 2002, approximately one and a half months prior to trial, Chambers sent a letter to the district court wherein he expressed his dissatisfaction with his counsel and requested a new attorney. On March 4, 2002, the district court held a hearing on the matter. For the record, the court summarized Chambers's letter: "[Y]ou say there's a conflict of interest, there's a lack of interest in defending your case, that there is withholding of information from you, and then you say those are to name a few reasons that you would like to be appointed a new attorney." Chambers expressed his opinion that he did not think that his attorney "believes anything I tell him," because his attorney told him as much. Chambers also stated that "I don't have my discovery. I don't know what – I don't know – I don't – I don't know what I'm doing." The district court then asked Chambers's counsel to comment. Counsel explained that Chambers has a low IQ, nearing borderline retarded levels, that he was examined at both the state and federal levels and found competent, but that counsel was having "a difficult time with him with this case, as did the previous attorney in the state proceedings."**2** Chambers had also requested a new attorney shortly before the state trial began. Counsel then explained that a main source of dispute was that Chambers wanted counsel to obtain for his review, while awaiting trial, the pictures at issue (which number approximately 10,000).

Counsel explained that he told Chambers this was not possible and Chambers became upset on numerous occasions. Counsel explained that for trial preparation purposes, Chambers had been allowed to view some representative photos from among the 10,000, as well as the photograph album seized from his apartment. Counsel also explained that he had been engaged in plea discussions with the government leading to a deal for "a fraction of the possible guideline ranges" and that he had recommended that Chambers "take advantage of that offer." Apparently, Chambers and counsel then "managed to butt heads" because Chambers insisted on asking for a few weeks to consider the plea deal, but counsel advised Chambers that the government was ready to proceed to trial and that this was the best offer he was going to get and should respond quickly.

Counsel further stated that preparing a defense had been difficult because Chambers was not being "candid" with him, but counsel did concede that "somewhere along the way, I suppose now he's lost some confidence, and I think that's probably paramount that a client have that." Counsel then stated that

> [i]f Mr. Chambers does not want me to represent him, although it's a very difficult case, I certainly don't want to press him. I think he should be comfortable with the counsel he wants. At the same time, I've been doing this for 25 years, Judge. I've probably tried more sexual offense cases than any attorney this side of the Mississippi unfortunately . . . and I am prepared to go forward and try and offer any defense we can to, certainly, some of the charges. . . . I stand at the pleasure of the Court to do whatever is necessary.

Counsel for the United States opposed any continuance of a trial date and noted that "discovery was provided last summer." The government clarified that all relevant images for this federal trial were provided to the defense. The government agreed to meet with Chambers and his counsel that afternoon to show him the images that the government would use at trial, but would not permit Chambers to take copies back to his jail cell.

The district court then addressed Chambers. "You know, you say you've got a conflict of interest, I don't see that; you say there's a lack of interest in your attorney defending your case; I don't see that. He's worked his rear end off for you, young man." The district court then stated that: "He's worked his rear end off for you. The discovery has been complete for a long time, and we're

---

**2**Chambers was convicted and sentenced to seventy years imprisonment as a result of the state proceedings.

going to trial in March, and Mr. Hughes is going to be your attorney. So you pay attention to what your attorney tells you, because he's giving you some good advice. You understand?" Chambers responded: "I guess I have to, Your Honor, with what you just told me." The court explained that Chambers is "entitled to a speedy trial and the citizens of this country are entitled to see that you have a speedy trial. And it's certainly not been very speedy up to this point in time, and we're going to correct that situation." The court then confirmed that Chambers had been found competent and denied the request for new counsel.

The jury found Chambers guilty on all counts and the district court imposed a sentence of life imprisonment.

## II.

A.      *The district court did not abuse its discretion by denying Chambers's request for new counsel.*

We review a district court's decision denying an attorney's motion to withdraw or a defendant's motion for substitute counsel for an abuse of discretion. *United States v. Mack*, 258 F.3d 548, 555-56 (6th Cir. 2001). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005). In *Mack*, this Court explained the factors relevant to the determination of whether a district court has abused its discretion:

> When reviewing a district court's denial of a motion to withdraw or substitute counsel, we generally must consider: (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*Mack*, 258 F.3d at 556 (citing *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999); *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996)).

### i.      Timeliness of the motion

Chambers requested new counsel approximately one and a half months prior to the scheduled trial date. His main reason, as it appears in the transcript cited above, was his belief that his counsel would not allow him access to discovery materials — *i.e.*, the pornographic imagines. Discovery, however, had been complete for nearly a year, but Chambers waited until just prior to trial to raise the issue regarding his dispute with counsel. Additionally, as defense counsel noted, Chambers did the same thing just prior to his state trial. Based on these facts, we do not believe that this factor supports Chambers's claim that the district court abused its discretion.

### ii.      Adequacy of the district court's inquiry

The second factor is the adequacy of the district court's inquiry. *Mack*, 258 F.3d at 556. Here, the record demonstrates that the district court engaged in a discussion with the defendant and counsel that covers numerous pages of transcript. Chambers was given an opportunity to explain the bases for his alleged conflict with counsel. Defense counsel was also given an opportunity to respond and gave a detailed explanation of the history of his representation of Chambers. Chambers was again permitted to speak following defense counsel, and the United States also weighed in, expressing its desire for a speedy and prompt trial. It appears to us that the district court allowed Chambers adequate opportunity to explain his concerns and allowed counsel to respond. Therefore,

we cannot conclude that the district court abused its discretion by conducting an insufficient inquiry into the extent of the alleged conflict.

### iii.    *Extent of the alleged conflict*

The third factor is the actual extent of the conflict between the defendant and counsel. *Id.* Here, the conflict was apparently over Chambers's access to the pornographic images that would be used against him at trial. Chambers also briefly asserted that he did not understand any of the proceedings. And, counsel also explained that there may have been some dispute over whether Chambers could ask the government for a few extra weeks to contemplate the plea offer. It appears from the transcript that Chambers was requesting things that counsel simply could not provide. Counsel could not allow Chambers access to the pornographic images in his jail cell nor could counsel require the government to hold open a plea deal for weeks on end. The district court in fact found that no conflict existed, and we see no evidence that would indicate the court abused its discretion in so finding.

### iv.    *The public interest in efficient administration of criminal justice*

The fourth factor is the effect of a change in counsel on the public's interest in the efficient administration of criminal justice. Chambers was indicted on November 16, 2000. Trial was not scheduled to begin until March 25, 2002, and Chambers did not request new counsel until February 13, 2002. The district court stated that the proceedings had been very slow moving up until that point and was reluctant to continue them any longer. The United States agreed. Defense counsel noted that it was a very difficult case, involving substantial discovery, including more than 10,000 images, a confession, various other evidence, state charges, plea negotiations, etc., and that it would be quite difficult for a new attorney to get up to speed in time for trial. Thus, in light of the weakness of Chambers's claim on the other three factors, we find no cause to conclude that the district court abused its discretion in concluding that the interests of the people of the United States in efficient administration of criminal justice outweighed Chambers's request for new counsel.

Finding that none of the four factors weigh in favor of a finding that the district court abused its discretion when it denied Chambers's request for new counsel, we accordingly reject Chambers's claim.

### B.    *Chambers's claim that he did not knowingly and voluntarily waive his right to testify is without merit*

At trial, Chambers made his own opening statement. During his statement he made claims regarding his conduct and his alleged innocence. Outside of the presence of the jury, the government requested, "depend[ing] on whether or not the defendant testifies" that "[i]f he elects not to take the stand, [the government] would ask that the jury be instructed to not consider any of that and that that is his opening statement, that's not evidence in this case." Defense counsel then stated, "Mr. Chambers has chosen not to testify in this case . . . [and] I would prefer that it be on the record in this case that he has chosen not to do that . . . and I would like to put it on the record that he has chosen not to testify and have him asked that and have that put on the record as well."

The following then ensued:

THE COURT:  All right. Mr. Chambers, is that true that you have chosen not to testify?

DEFENDANT CHAMBERS:  Yes, sir.

THE COURT:  You know you do have the right to testify if you elect to do so?

[DEFENDANT CHAMBERS]:  No, sir.

THE COURT:  And you've elected not to testify?

DEFENDANT CHAMBERS: Yes, sir.

The jury then returned to the courtroom and the trial proceeded.  Chambers did not testify on his own behalf.

"Barring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to *sua sponte* address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record." *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000); *United States v. Ortiz*, 82 F.3d 1066, 1069 n.8 (D.C. Cir. 1996) (noting the agreement of the First, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits that the trial court does not have a duty to *sua sponte* conduct an on-the-record colloquy regarding waiver); *see also United States v. Campbell*, 86 Fed. Appx. 149, 153 (6th Cir. 2004) ("This Court has explicitly rejected the contention that a trial court has a duty to require that a Defendant's waiver of his right to testify be made on the record by the trial court's *sua sponte* inquiry as to the Defendant's knowledge and intent of such waiver." (citing *Gonzales v. Elo*, 233 F.3d 348, 357 (6th Cir. 2000))).

When tactical decisions are made to have the defendant not testify, the defendant's assent is presumed. *Webber*, 208 F.3d at 551.  A defendant's decision whether or not to testify is his own, however, and he can reject counsel's advice and take the stand. *See, e.g.*, *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).  This Court's precedent holds that "'[a] Defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court or discharging counsel.'" *Gonzales*, 233 F.3d 348, 356 (quoting *Webber*, 208 F.3d at 551).  To exercise the constitutional right to testify, a defendant "must alert the trial court that he desires to testify or that there is a disagreement with defense counsel as to whether he should take the stand." *Campbell*, 86 Fed. Appx. at 154 (citing *Webber*, 208 F.3d at 551).

On appeal, Chambers has argued that the colloquy between himself and the district court was insufficient to demonstrate that he knowingly and voluntarily waived his right to testify.  Although Chambers's second response was "no," he did twice state that he was waiving his right to testify.  Moreover, the district court was not required to engage in the colloquy on the record in the first instance.  The district court questioned Chambers at defense counsel's request as a precaution to ensure that the waiver was on the record.  Additionally, during trial Chambers did not bring to the court's attention his desire to testify, and in fact, on appeal, has not even suggested that he wanted to testify.  Rather, Chambers has simply suggested that the record is insufficient to demonstrate that he knowingly and voluntary waived his right to testify.  Accordingly, when the record does not indicate that the defendant wanted to testify, waiver is presumed — this is, of course, because the court has no obligation to inquire into the matter.  Thus, on appeal, where there is no indication to the contrary in the record, the defendant must "overcome the presumption that he willingly agreed with his counsel's advice not to testify." *Gonzales*, 233 F.3d at 357.

Chambers does assert that he has a low IQ and therefore the district court should have engaged in a lengthier discussion of his relinquishment of the right to testify.  This misses the point, however, that the court has no obligation in the first place to conduct such an inquiry.  Chambers was found competent to stand trial.  The defense did not object to that finding.  There is simply no evidence upon which we could conclude that Chambers's waiver was not knowing and intelligent.

### C.          There was sufficient evidence to sustain the convictions

Chambers's next argument is that the evidence was insufficient to convict him. "When a conviction is attacked for insufficiency of the evidence, the evidence is viewed in the light most favorable to the prosecution to determine whether any rational trier of fact could have found each essential element of the offense beyond a reasonable doubt." *United States v. Barnett*, 398 F.3d 516, 521-22 (6th Cir. 2005) (citing *Hilliard v. United States*, 157 F.3d 444, 447 (6th Cir.1998)). This Court reverses a conviction for insufficient evidence "only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Stone*, 748 F.2d 361, 363 (6th Cir.1984). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Spearman*, 186 F.3d 743, 745 (6th Cir. 1999); *see also United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995).

### i.          The ten counts for violations of 18 U.S.C. § 2252(a)(1)

Under Section 2252(a)(1), the government must prove that: (1) the defendant knowingly transported or shipped, (2) in interstate or foreign commerce, (3) any visual depiction involving the use of a minor engaging in sexually explicit conduct. Chambers claims that the government's evidence is insufficient to prove beyond a reasonable doubt that he "knowingly used interstate or foreign commerce." (Chambers's Br. 18). Chambers concedes that the emailed visual depictions traveled from his home in Kentucky over the internet to California and to Nova Scotia. He asserts, however, that "there is no evidence that the Appellant was aware that interstate or foreign commerce would be used, or that he intended the e-mails to travel outside the state." *Id.*[3]

In *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994), the Supreme Court discussed Section 2252 and whether the term "knowingly" modifies just the surrounding verbs — transporting, shipping, receiving, distributing, and reproducing — or the surrounding verbs and also the minority of the performers and the sexually explicit nature of the activities. The court concluded the latter — that the scienter element "'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers." *Id.* at 78. The scienter requirement, however, does not extend to the fact that the materials which were *knowingly shipped*, traveled through interstate or foreign commerce. That is, the government is not required to prove that the defendant knew that channels of interstate commerce would be utilized when he shipped the images; rather, that fact in the statute is "jurisdictional." *See United States v. Feola*, 420 U.S. 671, 676-77 (1975). *Feola* instructs that "the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *Id.* at 677. The First Circuit reached this same conclusion in *United States v. Robinson*, 137 F.3d 652 (1st Cir. 1998). There, the court held that it did "not have the same [scienter] concern with the interstate commerce element, which confers federal jurisdiction over the crime." *Id.* at 655. Thus, the term "knowingly" does not apply to the jurisdictional fact that the depictions traveled in interstate or foreign commerce, and the government need not prove that when Chambers *knowingly* shipped the images that he also *knew* they would travel by interstate commerce. The evidence was sufficient to sustain Chambers's conviction.

---

[3]On this claim, Chambers alleges only that he did not know the depictions would travel in interstate commerce. He does not challenge the statute's constitutionality, as applied to his case, like he does for section 2252(a)(4)(B), *see infra*.

> ii.          *The one count for a violation of* 18 U.S.C. § 2423(a)

Pursuant to 18 U.S.C. § 2423(a), the government must prove that the defendant: (1) knowingly transported a minor across state lines, (2) with the intent to engage in sexual activity with the minor, and (3) that the minor was under eighteen at the time of the offense. Chambers does not dispute that he knowingly transported EJ across state lines or that sexual activity occurred or that EJ was under the age of eighteen. Chambers instead argues that he lacked the requisite intent to engage in sexual activity when he took the trip with EJ. In support of his claim, Chambers notes that he and EJ went on several trips across state lines both prior to and following the sexual activity. Chambers also notes that EJ told police that the purpose of their trip was to "pick up Bobby's mom."

The government's theory appears to be that after months of trying to seduce EJ into sexual activity, Chambers finally took EJ across state lines, away from his mother, to threaten EJ with harm if he did not engage in sexual activity. The government put forth evidence that Chambers cultivated a relationship with EJ and EJ's mother Michelle, that he bought EJ gifts, engaged in sexual conversations with EJ, told EJ that he "hustled" himself, asked EJ to have sex with him and with others for money, that he showed EJ videos of adults and children engaging in sex acts, and finally, upon finding himself alone with EJ at Ohio, threatening EJ and his family if he did not engage in sexual activity with Chambers. We believe that this circumstantial evidence is sufficient to establish guilt. That the jury found it sufficient to establish intent is not irrational. *See Spearman*, 186 F.3d at 745. When "the evidence is viewed in the light most favorable to the prosecution" many a rational triers of fact "could have found each essential element of the offense beyond a reasonable doubt." *Barnett*, 398 F.3d at 521-22 (6th Cir. 2005). Thus, we reject Chambers's claim that the evidence is insufficient on this count.

> iii.          *The one count for a violation of* 18 U.S.C. § 2252(a)(4)(B)

Section 2252(a)(4)(B) makes it a crime to "knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer . . ." if the depiction "involves the use of a minor engaging in sexually explicit conduct." The only evidence the government put forth in support of the interstate or foreign commerce connection was that the Polaroid film used was produced either in Massachusetts or the Netherlands. Chambers argues that the mere fact that the unused Polaroid film traveled in interstate commerce and was later used for illicit purposes is an insufficient nexus to interstate commerce, and the Act is unconstitutional as applied to his case.

In support of his claim, Chambers relies heavily on *United States v. Maxwell*, 386 F.3d 1042 (11th Cir. 2004), *vacated and remanded*, 126 S. Ct. 321 (2005). *Maxwell* sustained an as-applied challenge prohibiting knowing possession of child pornography for intrastate possession based solely on the fact that the computer disks on which the pornography was stored traveled in interstate commerce. *Id.* After Chambers's brief was filed, the Supreme Court granted certiorari, vacated the judgment, and remanded for further consideration in light of *Gonzales v. Raich*, 545 U.S. ----, 125 S. Ct. 2195 (2005). In light of *Raich,* Chambers's reliance on *Maxwell* is unhelpful.

On this claim, however, it is worth reviewing our precedent. First, in *United States v. Corp*, 236 F.3d 325 (6th Cir. 2001), this Court sustained an as-applied challenge, finding that the defendant's activities did not have a sufficient nexus with interstate commerce. Corp was a twenty-three year old defendant who was prosecuted for possessing child pornography which consisted of photographs of his seventeen year old girlfriend (who was less than two months shy of eighteen) and his twenty-six year old wife engaged in consensual sexual activity. *Id.* at 326. Federal jurisdiction was predicated on the fact that the photographic paper upon which the pictures were developed was

manufactured in Germany.  *Id.*  This Court reviewed *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000) and held that the Act was facially constitutional, but that because the particular defendant's activity was not substantially related to interstate commerce, the statute was unconstitutional as applied to his case.  *Corp*, 236 F.3d at 331-32.  This Court emphasized that the facts were unique and Corp's conduct was not the type of activity that Congress sought to prohibit under the Act.

> Under the undisputed circumstances here, Corp was not involved, nor intended to be involved, in the distribution or sharing with others of the pictures in question. Sauntman [the seventeen-year-old] was not an "exploited child" nor a victim in any real and practical sense in this case.  In the other cases that have addressed this issue, the courts were faced with the much more threatening situation where an adult was taking advantage of a much younger child or using the imagery for abusive or semi-commercial purposes . . . .

> Corp was not alleged to be a pedophile nor was he alleged to have been illegally sexually involved with minors other than Sauntman, who was merely months away from reaching majority.  Clearly, Corp was not the typical offender feared by Congress that would become addicted to pornography and perpetuate the industry via interstate connections.  Under these circumstances, the government has failed to make a showing that Corp's sort of activity would substantially affect interstate commerce.

*Corp*, 236 F.3d at 332-33.  The Court suggested that several factors are relevant to ensure that federal jurisdiction is proper:

> Was the activity in this case related to explicit and graphic pictures of children engaged in sexual activity, particularly children about fourteen years of age or under, for commercial or exploitive purposes?  Were there multiple children so pictured? Were the children otherwise sexually abused?  Was there a record that defendant repeatedly engaged in such conduct or other sexually abusive conduct with children? Did defendant move from place to place, or state to state, and repeatedly engage in production of such pictures of children?  These questions are relevant to a determination on a case-by-case basis about whether the activity involved in a certain case had a substantial effect on commerce.

*Id.* at 333.  The Court then vacated Court's conviction, "on the grounds that, reviewing the undisputed and unusual facts of this case, we are not persuaded that Corp's activity has a sufficient nexus with interstate commerce."  *Id.*

More recently, this Court reviewed a similar case, but in applying *Corp*, found federal jurisdiction proper and sustained the conviction.  *United States v. Andrews*, 383 F.3d 374 (6th Cir. 2004).  Jurisdiction was predicated in *Andrews* based on the fact that he purchased his computer from out of state and a pen camera used to take pornographic photographs was manufactured in China.  *Id.* at 376.  Andrews relied almost exclusively on the Court's opinion in *Corp*.  The panel discussed *Corp* in detail and applied the various factors discussed and concluded that there was a "stark distinction between the facts in *Corp* and the facts in this case."  *Id.* at 378.  For example:

> Andrews was clearly involved in exactly the type of child-exploitive and abusive behavior that Congress sought to prohibit in § 2251(b), using computer equipment that had been shipped in interstate commerce.  Andrews first forced two children aged 12 and under to watch sexually explicit photographs that presumably had been transmitted over interstate lines.  He then compelled them to engage in and to

photograph similar sexually explicit behavior, undoubtedly for the purpose of transmitting those photographs in the same manner. The children were vulnerable not only because of their age but also because they were under his care and control at the time, and their cooperation was clearly the result of coercion and outright threats to their safety. In addition, Andrews was in possession of several hundred pornographic photographs depicting unidentified children who appeared to be under the age of 12.

*Id.* Thus, the Court held that "[g]iven the scope of the evidence in the record, we have no doubt that the government established a sufficient nexus between the activity described . . . and interstate commerce to establish jurisdiction in this case." *Id.*

In *Maxwell*, however, the Eleventh Circuit held that the mere fact that the computer disks traveled in interstate commerce before child pornography was saved onto them was insufficient to confer federal jurisdiction under the Commerce Clause. 386 F.3d 1042. In *Maxwell*,

the Government established that Maxwell knowingly possessed child pornography in Florida. That pornography was saved on computer disks that traveled from out-of-state before they contained illegal images. The Government proved nothing more. Apart from the origin of the disks (before they had been committed to nefarious purposes), Maxwell's case involved no apparent connection to activity beyond Florida.

*Id.* at 1054. Applying *Lopez*, the court determined that, for federal jurisdiction to be proper, the intrastate possession of child pornography must "substantially affect interstate commerce." *Id.* at 1055 (quoting *Lopez*, 514 U.S. at 558). The court reasoned that "[i]f Maxwell's conduct has had any effect on interstate commerce, that effect is attenuated to say the least." *Id.* at 1058. The court found nothing commercial or economic about the possession of the images. *Id.* Finally, the court looked to Maxwell's specific conduct and determined that "[a]s far as interstate commerce is concerned, Maxwell has done nothing more than possess two disks that traveled from out-of-state. While possessing materials of production might conceivably have a direct impact on interstate commerce in certain circumstances, Maxwell's convictions present no such case. The causal chain necessary to link his activity with any substantial impact on interstate commerce might be long enough to reach the outer limits of the solar system." *Id.*[4]

Rejecting other circuits' consideration of the aggregate effect of such possession throughout the country,[5] the court held that the "aggregate approach cannot be applied to intrastate criminal

---

[4]*See also United States v. McCoy*, 323 F.3d 1114 (9th Cir. 2003). There, the court held, with regard to the jurisdictional element at issue here, 18 U.S.C. § 2252(a)(4)(B), that "[i]t not only fails to limit the reach of the statute to any category or categories of cases that have a particular effect on interstate commerce, but, to the contrary, it encompasses virtually *every* case imaginable, so long as any modern-day photographic equipment or material has been used." *Id.* at 1124; *see also United States v. Rodia*, 194 F.3d 465, 473 (3d Cir. 1999) ("As a practical matter, [§ 2252(a)(4)(B)'s] limiting jurisdictional factor is almost useless here, since all but the most self-sufficient pornographers will rely on film, cameras, or chemicals that traveled in interstate commerce and will therefore fall within the sweep of the statute.").

[5]*See also Maxwell*, 386 F.3d at 1061 ("By finding that Congress's power to regulate intrastate possession follows naturally from its power to regulate interstate possession, our sister circuits have taken two leaps. They first assume that intrastate possession affects the interstate market for child pornography. They then assume that this effect on the interstate market yields a substantial impact on interstate commerce. Whether or not a substantial effect on the interstate market for child pornography necessarily translates into a substantial effect on interstate commerce, we detect a flaw in their application of leap one. The effect on the interstate market — and ultimately interstate commerce — must be measured in relation to the isolated conduct at issue, rather than as a nationwide aggregate, because the intrastate possession of child pornography is a criminal, noneconomic activity.").

activity of a noneconomic nature." *Id.* at 1059. In sum, the court concluded that Maxwell's conduct, viewed independently, did not have a substantial effect on interstate commerce, and therefore his conviction could not stand. *Id.* at 1061; *see also id.* at 1063 (stating that the court "struggled to conceive of a possessor of child pornography who would not be subject to federal prosecution if Maxwell is. We could only imagine a possessor inhabiting an autonomous commune located in a single state.").

Since *Maxwell*, however, the Supreme Court decided *Raich* and vacated and remanded *Maxwell* in light of that disposition. In *Raich*, the Supreme Court reaffirmed "Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Raich*, 125 S.Ct. at 2205. The Court also adopted a definition of "economic" that includes production, distribution, and consumption. *Id.* at 2211. Several courts have reviewed similar as-applied challenges to various child pornography statutes in the wake of *Raich*, including this Court in an unpublished disposition, and have rejected those challenges.

In *United States v. Gann*, No. 04-5840, 2005 WL 3528917 (6th Cir. Dec. 21, 2005), this Court rejected an as-applied challenge based on the Commerce Clause. Gann argued that the possession charge against him must be reversed because the government's only evidence connecting his intrastate possession to commerce was that "the materials used by Gann to take pictures and to videotape his daughters, such as the computer, compact disks, video camcorder, and digital camera, were all manufactured" out of state. *Id.* at *3. We first noted that constitutional challenges of this type are reviewed *de novo*. *See United States v. Smith*, 182 F.3d 452, 455 (6th Cir. 1999). Comparing *Gann* to past cases, we found that Gann's case was more like *Andrews* than *Corp*. *Id.* at *5 ("We conclude that the facts of the instant case are almost indistinguishable from those of *Andrews*.").

We then turned to Gann's argument — which is Chambers's argument here — that the pornography was "homegrown" and therefore outside of the grasp of federal power. Citing *Raich*, this Court determined that "[a] finding that the one producing the pornography must intend to place it into the stream of interstate commerce is not necessary." *Id.* at *6. We noted that *Raich* determined that the Commerce Clause allows Congress "to prohibit the local cultivation and use of marijuana." *Id.* (quoting *Raich*, 125 S. Ct. at 2198). Likewise, the *Raich* Court reiterated *Lopez*'s reasoning that "when a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Raich*, 125 S. Ct. at 2206. (internal quotation marks and citation omitted). Further, the Court "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a rational basis exists for so concluding." *Id.* at 2208 (citing *Lopez*, 514 U.S. at 557).

With regard to child pornography, we determined that the *Raich* analysis governs. *Gann*, 2005 WL 3528917, at *6. We analogized the child pornography statutes to the legislation in *Raich* and determined that it too is part of "comprehensive legislation to regulate the interstate market in a fungible commodity." *Id.* Finally, we "conclude[d] that Congress has a rational basis for believing that homegrown child pornography can feed the national market and stimulate demand." *Id.* (internal citation marks, quotations, and alterations omitted). And, the fact that the pornography statutes encompass some purely intrastate activity is of "no moment." *Id.* (quoting *Raich*, 125 S. Ct. at 2209); *see also United States v. Forrest*, 429 F.3d 73, 79 (4th Cir. 2005) (rejecting defendant's claim, pursuant to *Raich*, that he could not be prosecuted under the commerce power for purely intrastate production of child pornography); *United States v. Jeronimo-Bautista*, 425 F.3d 1266, 1273 (10th Cir. 2005) (same).

For these reasons, Chambers's as-applied challenge fails.

### D.      *Evidentiary Questions*

"A district court's evidentiary rulings are reviewed for abuse of discretion." *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005) (citing *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004)).  Thus, this Court does not disturb rulings on the admissibility of evidence unless the Court is "left with the definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached." *Id.* (citation and internal quotation marks omitted). An abuse of discretion will be found if the district court relies on clearly erroneous findings of fact, improperly applies the law or uses an erroneous legal standard." *Id.* (citing *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir.1995)).  "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *Id.* (citation and internal quotation marks omitted).  A new trial is not required unless the error affects substantial rights.  Fed. R. Crim. P. 52.

### i.      *Alleged hearsay statements*

Chambers claims that the district court erred when it admitted the hearsay statements of Joey Pennington via the testimony of Roy Ison, the investigating officer.  Ison testified that he interviewed Pennington and that Pennington told him that he had seen Chambers engaging in sexual activity at Chambers apartment with EJ, one of the victims in this case.

During Ison's testimony relaying Pennington's statements, defense counsel initially objected, but then withdrew his objection.  The district court clarified that there was no objection to the testimony, defense counsel responded, "[l]et it roll," and Ison proceeded to testify regarding Pennington's statements.  Because counsel withdrew the exception, this Court reviews the admissibility of the hearsay statements for plain error.  *United States v. Cowart*, 90 F.3d 154, 157 (6th Cir. 1996) (noting that the usual abuse of discretion standard is "superseded when . . . the complaining party failed to object to the evidence in the district court. Our review under these circumstances is for plain error").  Plain error is established where an error that is plain affects the defendant's substantial rights and, in this Court's discretionary view, the error seriously affects the fundamental fairness, integrity, or public reputation of judicial proceedings.  *United States v. Sanders*, 404 F.3d 980, 984 (6th Cir. 2005) (citing *Johnson v. United States*, 520 U.S. 461, 466 (1997) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993))).

Chambers simply asserts that Ison's testimony was improper and damaging in that it corroborated EJ's story.  On cross-examination, however, defense counsel attempted to undermine both Ison and Pennington by asking Ison whether he knew that Pennington had testified under oath in another proceeding and admitted to lying to police.  The parties then engaged in several pages of transcript presenting differing versions of what Pennington testified to, what he actually recanted, and what he continued to stand by after his testimony in the state proceedings.

We conclude that Chambers has not demonstrated that the admission of this testimony was plain error.  It was hearsay, offered for the truth of the matter asserted, and intended to corroborate EJ's testimony regarding the section 2423(a) count.  Defense counsel, however, withdrew his objection to the testimony, seemingly in order to attempt to undermine Pennington's statements and Ison's testimony during cross-examination.  Moreover, even if this were error, it was harmless and therefore cannot rise to the level of being plain.  The evidence against Chambers was overwhelming and independently sufficient to establish guilt.  *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) ("Given the extensive testimony at trial supporting [the defendant]'s guilt on the counts of conviction, this Court finds that the district court's exclusion of the hearsay evidence was harmless error.") (citations omitted).

### ii.     The Notebook

Chambers argues that it was error for the district court to allow Ison to read from Chambers's diary, which was alleged to contain graphic descriptions of sex acts between Chambers and the victims. Chambers asserts that this evidence was admitted in error because he was not charged with these specific acts and the only purpose of the evidence was to "shock the jury, and paint the appellant in a bad light." At trial, defense counsel objected to this evidence. The government requested its admission, stating that it "clearly shows he knows Jonathan E[] and it corroborates the sexual experiences that he had with him. It may be prejudicial, but I don't believe it's unduly prejudicial." The district court agreed and admitted the evidence.

Under Federal Rule of Evidence 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "Because appellate courts work with a record which cannot fully convey a trial's nuances, dynamics and atmosphere, they have a limited capacity to review the balance struck by the trial court. Consequently, we will not reject a trial court's balancing unless the 'substantial prejudice' clearly outweighs the 'probative value.'" *United States v. Swift*, 809 F.2d 320, 323 (6th Cir. 1987) (citing *United States v. Brady*, 595 F.2d 359, 361 (6th Cir.), *cert. denied*, 444 U.S. 862 (1979) ("In reviewing a decision of a trial court on this issue we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.")). Thus, the standard of review is whether the district court abused its discretion in making its determination. *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996). Finally, "the prejudice to be weighed is the *unfair* prejudice caused by admission of the evidence. Evidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial pursuant to Rule 403." *Id.* (emphasis in original).

In this case, Chambers has failed to demonstrate how the prejudice was *unfair*. The diary entries establish Chambers's knowledge that the victims were minors and that Chambers engaged in sexual acts with EJ. The evidence certainly painted Chambers in a bad light, but it went to elements of proof essential for the prosecution's case — particularly, Chambers's knowledge that he was engaging in sex acts with minors. There is no evidence to support the claim that the district court abused its discretion when it determined that the probative value was not substantially outweighed by the danger of any unfair prejudice to Chambers.

### iii.     Michelle C.'s Testimony

Chambers also challenges Michelle's testimony under Rule 401 as being irrelevant and under Rule 403 as being unduly prejudicial. Chambers claims that Michelle was permitted to inform the jury: "(1) that the Appellant was bisexual; (2) that the Appellant was using a man named Nelson Benzring for his money; (3) that the Appellant prostituted himself and was a 'hustler'; and (4) that the Appellant looked at websites of persons having sex with dead people." (Chambers's Br. 28-29). The government submits that this evidence was not unduly prejudicial and was relevant in establishing Chambers's "motivation to rape EJ" and that Michelle's testimony corroborated EJ's. The government further submits that Michelle's testimony regarding the web site was relevant to the charge of transmitting child pornography via the internet. The government also claims that, in conjunction with Chambers's own written statement to police, regarding his viewing of pornography on the internet, "intertwined with evidence relating to his use of the WebTV, also showed that Chambers had the motive, knowledge, intent, and opportunity to transmit child pornography over the internet." (United States Br. 37). Chambers did not object to this testimony at trial, and therefore this Court reviews its admission under the plain error standard discussed above.

Chambers has not cited any case law nor has he endeavored to explain why the evidence is irrelevant or unduly prejudicial, other than the simple assertion that it is so. We agree with the

government as to the evidence's relevance to establish motive and opportunity, and we see no cause to conclude that the admission of the evidence was error, let alone plain error.

### III.

Although we reject Chambers's claims regarding his convictions, we agree with the parties that Chambers is entitled to be resentenced. We therefore AFFIRM Chambers's convictions, but VACATE his sentence and REMAND for resentencing.