NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0190n.06

No. 09-5003

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Mar 28, 2011**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| LARRY AMMONS, | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

Before:  SUTTON and STRANCH, Circuit Judges; WELLS, District Judge.[*]

SUTTON, Circuit Judge.  Before his trial on five counts of being a felon in possession of a firearm, Larry Ammons moved to suppress the firearms and requested new counsel.  The district court denied both motions, and a jury convicted Ammons on all five counts.  On appeal, Ammons urges us to hold that the district court infringed his Sixth Amendment right to counsel and that the two searches—one of a house, one of a truck—violated the Fourth Amendment.  We disagree and affirm.

I.

Early one morning, Deputy Sheriff Heath Walker investigated a theft at a house in Newbern, Tennessee.  When he arrived, Robert and Billy Shanklin told Deputy Walker that their mother, Judy

---

[*]The Honorable Lesley Wells, Senior District Court Judge for the Northern District of Ohio, sitting by designation.

Shanklin, owned the house (though she was not living there at the time) and that her ex-boyfriend, Ammons, lived in a camper in the driveway and was remodeling the house. When the brothers found some of their mother's belongings in the house, they concluded that Ammons had stolen them and hidden them there. Judy Shanklin soon arrived and asked Walker to search the house for other missing things. A search turned up more items, prompting the police to arrest Ammons for theft. After the police left, Billy Shanklin found several pawn shop receipts, and further investigation revealed that Ammons, a convicted felon, had pawned three firearms.

A week later, a trusted informant told the Tennessee Bureau of Investigation that Ammons, by then out on bond, would be towing a stolen tractor to Lauderdale County the next day to sell it. When officers saw Ammons towing a tractor into Lauderdale County, they pulled him over. An officer saw a revolver and a pistol box through the truck's window and seized them.

A federal grand jury indicted Ammons on five counts of being a felon in possession of a firearm: three counts for the pawned firearms and two for the firearms found in the truck. Ammons moved to suppress the firearms, arguing that the searches violated the Fourth Amendment. A magistrate judge recommended denying the motion. Ammons' counsel filed a motion for reconsideration, and Ammons filed a pro se motion for the appointment of new counsel. The district court denied the motion for new counsel, finding no good cause. After a second suppression hearing and a supplemental report from the magistrate judge, the district court denied the suppression motion. A jury found Ammons guilty on all five counts, and the court sentenced him to 215 months in prison.

II.

"In all criminal prosecutions," the Sixth Amendment says, "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. That includes the right to representation "by an otherwise qualified attorney . . . willing to represent the defendant," *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006), and the right to a "choice of counsel," *id.* at 142, though the latter is limited in "important respects," *Wheat v. United States*, 486 U.S. 153, 159 (1988), and must be "balanced against the court's authority to control its own docket," *United States v. Green*, 388 F.3d 918, 921 (6th Cir. 2004).

The defendant bears the initial burden to "bring any serious dissatisfaction with counsel to the attention of the district court." *Benitez v. United States*, 521 F.3d 625, 632 (6th Cir. 2008). Once that happens, the court may grant a request for new counsel if the defendant establishes "good cause," *id.*, an inquiry that considers the timeliness of the defendant's request, the extent to which the breakdown in the lawyer-client relationship "prevent[ed] an adequate defense" and "the public's interest in the prompt and efficient administration of justice," *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001). We review the district court's assessment of these factors, along with the adequacy of the district court's inquiry into the matter, for abuse of discretion. *United States v. Chambers*, 441 F.3d 438, 446 (6th Cir. 2006).

The district court permissibly rejected Ammons' motion for new counsel. The court initially appointed the Federal Public Defender to represent Ammons, but six months later Ammons retained

private counsel, Charles Waldman. The district court pushed back the trial date, originally set for August 2006, several times while Waldman got up to speed and prepared a motion to suppress. After the magistrate judge recommended denying the suppression motion, Waldman filed a motion for reconsideration, asking for a second hearing to allow Judy Shanklin to testify on Ammons' behalf. That same day, Ammons filed the first of two pro se motions to dismiss Waldman, and Waldman soon filed a motion to withdraw, prompting the court to hold a hearing on the issue.

When the court asked Ammons to explain his concerns, he complained about Waldman's lack of communication: "There [were] months on end when I would say he needs to come see me. . . . He said he would be there Tuesday, that went on for two months. I will be there Tuesday, I will be there Tuesday. He has never responded to any letter ever written to him, ever." R.145 at 8–9. Ammons also raised a substantive concern, that Waldman did not call Judy Shanklin at the first suppression hearing and that he failed to produce several documents related to the traffic stop. Both concerns, the court found, stemmed from the stress of trial and unwelcome developments on the suppression motion, noting that "there was no indication of being unhappy with counsel until we had an adverse determination by the magistrate judge." *Id.* at 15–16.

Against these concerns the district court balanced its own concern that the case "[had] been going on too long" and that this second substitution of counsel would lead to further delays. *Id.* at

11, 14. The court explained that some disagreement with counsel is neither unusual nor always avoidable:

> [A] lot of times materials that parties perceive as, quote, critical to their case or witnesses that are critical to their case are . . . not necessarily even useful in the case and may present situations where they're actually adverse in some way. It's as though the patient who has cancer goes to the doctor and says we need to do this and we need to do this . . . and the doctor or maybe a team of doctors knows that this is not an appropriate therapeutic procedure or process, so what is intuitive or what appears to be a good idea or what reading the law books may suggest to a layman may not be appropriate or even admissible in a court of law.

*Id.* at 10–11. The court denied the motion, but assured Ammons that, if a critical strategy issue arose at the trial scheduled for the next month, they could "talk[] about" it then. *Id.* at 12.

None of this exceeded the court's "broad discretion." *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009). The record does not suggest that the disagreement between Ammons and Waldman was "total or irreconcilable," *id.* at 468, "preventing an adequate defense," *Mack*, 258 F.3d at 556. The hearing, to the contrary, showed that Ammons communicated regularly with Waldman and that Waldman tried to accommodate his client's wishes while "bring[ing] to bear [his] skill and knowledge" as a defense attorney. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Even before Ammons filed his motion for new counsel, Waldman had filed the reconsideration motion to remedy Ammons' concern that Judy Shanklin should testify. A defendant is not entitled to new counsel and the delay that comes with it every time he disagrees with counsel's strategic judgment.

Ammons, it is true, did not wait until the eve of trial to make the request, which cuts in his favor. But the request still came after earlier delays and, in the district court's judgment, would have

set the trial date back "another six months." R.145 at 14. Ammons insisted he was "asking only for 30 days," *id.* at 14, but, using the past substitution as precedent, the district court reasonably could predict that it would take more time to bring new counsel up to speed. The court not only gave Ammons a full "opportunity to explain the bases for his alleged conflict with counsel," *Chambers*, 441 F.3d at 447, but also tried "to ease the defendant's distrust," *United States v. Iles*, 906 F.2d 1122, 1131 (6th Cir. 1990). The district court also concluded, again reasonably, that "the public's interest in the prompt and efficient administration of justice," *Mack*, 258 F.3d at 556, weighed against a substitution.

That is all well and good, Ammons responds, but one month after the district court denied the motion to withdraw, the government filed a superseding indictment. At that point, he explains, any concerns about delay "melted away" because "[t]here was no way the case would proceed to trial as scheduled with Ammons facing new and uninvestigated allegations." Ammons Br. at 19–20. But the new indictment added no new counts. Instead, the serial number listed in Count 2 changed from "T10227703" to "T0127703" and in Count 3 from "131403834" to "B1403834." *Compare* R.1, *with* R.87. That is all. These "new and uninvestigated allegations" had nothing to do with Ammons' complaints, and as it turned out the case proceeded promptly to trial. Having heard Ammons' concerns and having ruled on his motion, the district court did not need to inquire anew into Ammons' concerns simply because the defendant wanted to try again based on this inconsequential change to the indictment. No Sixth Amendment violation occurred.

III.

The Fourth Amendment prevents "unreasonable searches and seizures" by federal law enforcement, and the Fourteenth Amendment via incorporation prevents the same by state law enforcement. *See Aguilar v. Texas*, 378 U.S. 108 (1964); *Mapp v. Ohio*, 367 U.S. 643 (1961). Ammons challenges the search of the Newbern house and the search of his truck. Neither search, however, crossed these constitutional limits.

*The Search of the House*. Officers ordinarily must obtain a warrant before searching a house, *Vale v. Louisiana*, 399 U.S. 30, 34 (1970), and evidence recovered in violation of this rule generally may not be used against someone with a reasonable expectation of privacy in the house, *Weeks v. United States*, 232 U.S. 391–93 (1914). One "well-delineated exception" to this rule turns on consent, as "[a]n officer with consent" does not need a warrant "to conduct a constitutional search." *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996). Officers generally may establish consent in one of three ways: (1) the defendant consents; (2) someone with "joint access or control for most purposes" over the area consents, *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974); or (3) the officers "conduct[] the search in good faith reliance on the third-party's *apparent authority* to authorize the search through her consent," *United States v. Purcell*, 526 F.3d 953, 963 (6th Cir. 2008). At the very least, the officers in this instance searched the house in good faith reliance on Judy Shanklin's apparent authority to consent.

When Judy Shanklin told Deputy Walker to search the house, he knew she owned it, and Shanklin's sons had just told him that Ammons was living in the camper in the driveway while the unoccupied house underwent renovations. That suffices to establish apparent authority because the "facts available to the officer" at the time of the search supported a reasonable "belief that the consenting party"—Shanklin—"had authority over the premises" as the owner of the house. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quotation marks omitted). The reality, it is true, was more complicated. As it turned out, Ammons had previously dated Judy Shanklin and had stayed at her home in Dyersburg, Tennessee, for some period of time. He sold Shanklin the house in Newbern, and the two made plans to renovate it. The romantic relationship fizzled, but the agreement remained intact, and Ammons moved into his former house while he completed the renovations. R.96 at 3.

No doubt, property owners in some circumstances lack authority, apparent or otherwise, to consent to the search of property occupied by others. *See, e.g.*, *Stoner v. California*, 376 U.S. 483, 490 (1964) (hotel owner lacked apparent authority to consent to search of hotel room); *Chapman v. United States*, 365 U.S. 610, 616–17 (1961) (property owner lacked actual authority to consent to search of rented house). But in arguing that Shanklin was a "landlord" of the Newbern house, Ammons stretches those cases and these facts. Shanklin and Ammons, for one, did not have anything approaching a traditional landlord-tenant relationship, whether in reality or in appearance. And Deputy Walker, for another, could readily believe that Shanklin had authority to consent under

the circumstances presented in view of her sons' statements that she owned the house and that no one was living in it at the time. *Rodriguez*, 497 U.S. at 188.

But even if Shanklin had apparent authority to consent to the search of the house, Ammons adds, that would not override his authority to object to it. *See Georgia v. Randolph*, 547 U.S. 103 (2006) (suppressing the results of a consent search where a present co-occupant expressly refused consent). This argument, however, founders on the district court's factual findings and the standard of review. Deputy Walker testified that Ammons "[n]ever object[ed] at any point to [his] being in the house." R.141 at 29. Following the two suppression hearings, the district court concluded that "[t]here is no evidence . . . that Mr. Ammons objected to the search." R.96 at 6. On the second day of *trial* (as opposed to the suppression hearing), Ammons took the stand and testified that he told the Shanklin brothers and the police to leave the house in Newbern on the morning of the search. *See* R.131 at 294–96. Following this testimony, however, Ammons did not renew his motion to suppress, and as a result he cannot use his later trial testimony to attack the earlier denial of his suppression motion. *See United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir. 1989); *cf. Ortiz v. Jordan*, __ U.S. __, 131 S. Ct. 884, 889 (2011). Even if Ammons had renewed the motion, the district court at most would have faced a conflict between Deputy Walker's testimony at the suppression hearing and Ammons' testimony at trial. It hardly would amount to clear error, *see Panak*, 552 F.3d at 465, let alone plain error, to credit the officer's version of events.

*The Search of the Truck.* Ammons also challenges the search of the truck, claiming that the officers lacked reasonable suspicion that Ammons had committed or was committing a crime. *See Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 770–71 & n.6 (6th Cir. 2004). We disagree.

The confidential informant's tip gave the officers reasonable suspicion to stop Ammons. The tip bore the requisite "indicia of reliability." *Florida v. J.L.*, 529 U.S. 266, 270 (2000). The informant was known to the police and had provided reliable information in the past. *See United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc); *United States v. Smith*, 182 F.3d 473, 483 (6th Cir. 1999). His "reputation [could] be assessed," and he could "be held responsible if [the] allegations turn[ed] out to be fabricated." *Florida v. J.L.*, 529 U.S. at 270. The informant, moreover, gave detailed, not general, information, as he spoke specifically about Ammons, the truck and when and where Ammons would be the next day. Nor did Agent Bishop leave it at that. He "personally verified every facet of the information" the next day, save for the fact that the tractor was stolen, before stopping Ammons, providing "reasonable grounds" for believing the "remaining unverified bit." *Draper v. United States*, 358 U.S. 307, 313 (1959). In view of this universe of circumstances, *see Illinois v. Gates*, 462 U.S. 213, 230 (1983), the tip supported the traffic stop.

It makes no difference what "the actual motivations of the individual officers" happened to be at the time of the stop. *Whren v. United States*, 517 U.S. 806, 813 (1996). That the officers may have mistakenly believed that the parole office had obtained a warrant for Ammons' arrest or had other misconceptions about Ammons does not undermine the stop so long as there otherwise was a reasonable basis for it. There was.

IV.

For these reasons, we affirm.