NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0425n.06

Nos. 13-1892/2199

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jun 08, 2015 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RAYNARD V. CROWE (13-1892); ALFRED R. | ) | COURT FOR THE EASTERN |
| WINGATE, JR. (13-2199), | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE:   MOORE, GIBBONS, and GRIFFIN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge.  A federal jury convicted Raynard Crowe and Alfred Wingate of several robbery and firearm-related counts stemming from the robberies of two pharmacies and a bank, and the defendants received 535-month and 684-month prison sentences respectively.  The defendants make a total of five arguments on appeal.  First, Crowe argues that his Sixth Amendment Confrontation Clause rights were violated by the closing argument of Wingate's counsel.  Second, Crowe contends that Congress exceeded its authority under the Commerce Clause when criminalizing pharmacy robbery.  Third, Wingate argues that his trial counsel was constitutionally ineffective.  Fourth, Wingate seeks relief on the basis that the trial court failed to submit to the jury the "brandishing" element that increased his sentence under the relevant firearms statute.  Finally, both defendants argue that a Sixth Amendment violation arose when the district court imposed consecutive, enhanced sentences for "second or

subsequent" convictions based on offenses charged in the same indictment.[1] For the reasons that follow, we affirm both defendants' convictions and sentences.

I.

Crowe and Wingate were tried for offenses arising from three separate robberies, the first of which occurred at the Citizens Bank in Grosse Pointe Woods, Michigan in May 2011. Six days before the robbery, Crowe opened an account, listing a false address on the application. He recruited Wingate and four others to assist, providing two of them with guns.

On May 18, Crowe, Wingate, and one of their co-perpetrators arrived at Citizens Bank in a minivan belonging to Wingate's fiancée. Crowe entered the bank and withdrew $10 from his account. Crowe then relayed information about the situation inside the bank to Wingate and another co-perpetrator who were waiting outside. A short time later, Wingate and the co-perpetrator entered the bank and pulled masks over their faces. Surveillance cameras captured their unmasked faces before they entered. Each pulled out a handgun. The co-perpetrator held a gun to the head of one of the two bank tellers and Wingate—pointing his gun—jumped over the counter to retrieve the money. A customer entered the bank during the robbery and the co-perpetrator, pointing the gun at the customer, forced him onto the ground. The two men left the bank with $45,350 in cash. Crowe later divided the money among all those who had helped with the robbery. The next day, a police officer discovered $1,543 in cash in Crowe's possession. Days later, Wingate's fiancée deposited $3,000 in cash that she had received from Wingate.

The second robbery occurred at Medicap Pharmacy in Warren, Michigan, on June 18, 2011.[2] Crowe again provided firearms to Wingate and another member of the group. They

---

[1] We grant Crowe's motion to join and adopt this argument after Wingate raised it in his briefs. Crowe also moved to adopt Wingate's brandishing argument. For the reasons stated below, we deny Crowe's motion to adopt this argument.

planned to steal money and controlled substances that could be sold on the street. Wingate and a co-perpetrator entered the pharmacy, wielding guns, and demanded drugs and cash. The co-perpetrator wore a mask during the Medicap robbery but Wingate did not. One of the pharmacy workers, Heather Cavitt, identified Wingate at trial. Both assailants pointed guns at pharmacy workers during the course of the robbery. A video surveillance camera captured the incident. The two men left the pharmacy carrying a large duffel bag containing money, drugs, and their handguns. Wingate gave the bag to the other man and then fled. The police later recovered the bag and its contents in a nearby residential neighborhood and then arrested the co-perpetrator. Wingate remained at large.

Crowe and Wingate reassembled the group with some new members and planned the third robbery: that of the Ferndale Pharmacy on July 11, 2011. Their main objective was to steal prescription drugs. Crowe gave a firearm to at least one of the group members for use in the robbery. Shortly before closing time, Wingate entered the pharmacy with one of the new co-perpetrators, both carrying guns. Crowe remained across the street. Wingate went around the counter to obtain the drugs. At gunpoint, he ordered an employee to put prescription drugs into Wingate's bag. The employee dialed 911 and kept the call connected, with the cell phone in her pocket, while the robbery took place. Meanwhile, the other assailant placed the employees on the ground and tied their hands with zip ties. Carrying the bag filled with drugs, Wingate and the other man went toward the back door. Police officers arrived as they were exiting and, though the two men tried to run, they were soon arrested. Crowe escaped and fled the state but was later arrested in Arizona.

---

[2] Crowe was ultimately acquitted of the Medicap robbery.

A federal grand jury indicted Crowe and Wingate each for one count of bank robbery in violation of 18 U.S.C. § 2113(a), two counts of pharmacy robbery in violation of 18 U.S.C. § 2118(a), three counts of using or carrying a firearm during a federal crime of violence under 18 U.S.C. § 924(c), several counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (four counts for Crowe, two counts for Wingate), and conspiracy to commit each of these crimes. The district court denied Crowe's pre-trial motion to dismiss the pharmacy counts as extending beyond Congress's authority under the Commerce Clause.

A joint jury trial took place in the Eastern District of Michigan in March 2013. The jury convicted Wingate of all counts. Crowe was acquitted of one of the two counts of pharmacy robbery, one of the two counts of using or carrying a firearm during a federal crime of violence, and two of the four counts of being a felon in possession of a firearm. He was found guilty of all other counts. Both defendants appeal.

II.

Crowe first argues that his Sixth Amendment rights were violated pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), when Wingate's counsel admitted during closing arguments that Wingate had committed the Ferndale robbery. The relevant portion of the closing argument was as follows:

> As regards to the Ferndale robbery, Mr. Wingate takes responsibility. As you know, through trial, we didn't cross-examine any witnesses [as to the Ferndale robbery]. We didn't challenge any witnesses. . . . [U]nderstand[] [that] for Ferndale, yes, he takes responsibility. And not only does he take responsibility – and I believe I can say this on behalf of my client. Ferndale, as you know, dealt with his son.

The parties dispute whether Crowe properly preserved this argument. We review a preserved Confrontation Clause claim *de novo*, *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007), but review an unpreserved claim for plain error, *United States v. Martinez*,

588 F.3d 301, 313 (6th Cir. 2009). The standard of review for this particular issue is ultimately immaterial because Crowe's argument would fail even under a *de novo* standard.

*Bruton* established that "[a]n accused is deprived of his rights under the Confrontation Clause when the confession of a nontestifying codefendant that implicates the accused is introduced into evidence at their joint trial[,] . . . even if the jury is instructed to consider the confession only as evidence against the codefendant." *United States v. Cope*, 312 F.3d 757, 780 (6th Cir. 2002) (citing *Bruton*, 391 U.S. at 137). We have since "extended the *Bruton* principle by holding that a defendant's Sixth Amendment right to confront witnesses is violated not only when the court admits the *confession* of a nontestifying codefendant, but also any *statement* made by a codefendant that implicates the accused." *Id.* (citing *United States v. Bartle*, 835 F.2d 646, 651 (6th Cir. 1987)). Because the *Bruton* principle is premised upon the Confrontation Clause, the principle applies only to testimonial statements. *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009); *see generally Davis v. Washington*, 547 U.S. 813 (2006) (discussing the meaning of "testimonial").

Crowe's claim does not fall within the scope of the *Bruton* principle for at least two distinct reasons. First, the statement at issue is not testimonial evidence because it was made by counsel. *See Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) ("[S]tatements by counsel are not 'testimony.'"). Indeed, it was not evidence of any kind, as the district court instructed the jury.[3] *See United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011); *United States v. Wilson*, 605 F.3d 985, 1017 (D.C. Cir. 2010) (declining to apply the *Bruton* principle, partly because "[t]he opening statement and closing argument made by [counsel] neither were admitted into evidence nor were they testimony").

_____

[3] The district court gave the following instruction: "The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. . . . These things are not evidence and you are bound by your oath not to let them influence your decision in any way."

Second, even if Wingate's lawyer's statement had been testimony, it would not trigger *Bruton* because the statement did not implicate Crowe either explicitly or implicitly. It conceded Wingate's involvement but did not refer to Crowe at all. We have previously held that *Bruton* does not bar a co-defendant's statement that does not refer to the accused, even if that statement "becomes incriminating when linked with other evidence adduced at trial." *United States v. Ford*, 761 F.3d 641, 654 (6th Cir. 2014) (internal quotation marks omitted). Crowe therefore falls far short of establishing a Confrontation Clause violation.

III.

Crowe's second argument is that his conviction for Count Six in the indictment is invalid because the criminalization of intrastate robberies of controlled substances in 18 U.S.C. § 2118(a)(1) exceeds the bounds of congressional authority under the Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3. We review the constitutionality of the statute *de novo*. *United States v. Rose*, 522 F.3d 710, 716 (6th Cir. 2008).

The Commerce Clause authorizes three general categories of congressional activity. First, Congress may regulate the channels of interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 16 (2005). Next, Congress may "regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce." *Id.* at 16–17. Under the third category, the only one at issue in this case, "Congress has the power to regulate activities that substantially affect interstate commerce." *Id.* at 17. Regulation of intrastate, "purely local" conduct is permitted under this third category when the conduct is "part of an economic class of activities that have a substantial effect on interstate commerce." *Id.* (internal quotation marks omitted); *see also Wickard v. Filburn*, 317 U.S. 111, 125, 128–29 (1942). Economic activities

include the production, distribution, and consumption of commodities. *Raich*, 545 U.S. at 25–26.

Under this framework, the Supreme Court has upheld statutes that are "one of many essential parts of a larger regulation of economic activity in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Raich*, 545 U.S. at 24–25 (internal quotation marks and alterations omitted). Moreover, a statute's effect on interstate commerce must be viewed not in isolation but in the aggregate: "[W]hen 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'" *Id.* at 17 (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995)). And, crucially, the issue is not whether the regulated economic activity—when taken in the aggregate—*in fact* has a substantial effect on interstate commerce, "but only whether a 'rational basis' exists for so concluding." *Id.* at 22 (quoting *Lopez*, 514 U.S. at 557).

Applying these principles, the Supreme Court distinguished the permissible regulation in *Raich*—the regulation of the growing of medicinal marijuana—from statutes the Court had previously invalidated: a statute criminalizing the possession of guns in school zones, *see United States v. Lopez*, 514 U.S. 549 (1995), and a statute providing a federal civil remedy for victims of gender-motivated violence, *see United States v. Morrison*, 529 U.S. 598 (2000). The *Raich* Court explained that the cultivation of medical marijuana is "quintessentially economic," unlike the statutes at issue in *Lopez* and *Morrison*. *Raich*, 545 U.S. at 25–26. The possibility that medical marijuana could be grown and distributed on a purely local level did not make the overall regulatory scheme constitutionally deficient. *Id.* at 26. The Court expressed its reluctance to invalidate individual portions of a comprehensive regulatory scheme and thus explained: "[t]hat the regulation ensnares some purely intrastate activity is of no moment." *Id.* at

22; *see also id.* at 23 ("Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." (internal quotation marks and alterations omitted)); *id.* at 28 ("The congressional judgment that an exemption for such a significant segment of the total market would undermine the orderly enforcement of the entire regulatory scheme is entitled to a strong presumption of validity.").

Consistent with those Supreme Court precedents, we have upheld—under rational-basis review—a federal statute criminalizing carjacking, *United States v. McHenry*, 97 F.3d 125, 129 (6th Cir. 1996), and another criminalizing possession of child pornography, *United States v. Chambers*, 441 F.3d 448, 454–55 (6th Cir. 2006), even though the defendants' activities in those cases were wholly intrastate. The *McHenry* court reasoned that "carjacking is itself an economic transaction, albeit a coercive one" because "[w]hen a criminal points a gun at a victim and takes his or her car, the criminal has made an economic gain and the victim has suffered an undeniable and substantial loss." 97 F.3d at 127 (quoting *United States v. Bishop*, 66 F.3d 569, 581 (3d Cir. 1995)). It further explained that the carjacking statute "addresses 'economic evils of an interstate nature,' even though each instance of the evil activity may not necessarily cross state lines." *Id.* (quoting *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995)). The court held that Congress had a rational basis to believe that, considered in the aggregate, carjacking has a substantial effect on interstate commerce. *Id.* at 127. Applying a similar line of analysis in *Chambers*, we viewed the criminalization of child-pornography possession as "part of comprehensive legislation to regulate the interstate market in a fungible commodity." 441 F.3d at 455 (internal quotation marks omitted). Regardless of the purely local nature of the criminal conduct before the court in *Chambers*, Congress still had a rational basis to believe that regulation would substantially affect interstate commerce. *See id.*; *see also United States v. Bowers*, 594 F.3d 522,

528 (6th Cir. 2010) ("[T]here is no question that Congress has a legitimate basis for attempting to regulate the interstate market in child pornography and that the statutes that [the defendant] challenges are part of a larger comprehensive scheme to regulate that illicit interstate market.").

Crowe's conviction of Count Six was premised on 18 U.S.C. § 2118(a)(1), which criminalizes taking or attempting to take

> from the person or presence of another by force or violence or by intimidation any material or compound containing any quantity of a controlled substance belonging to or in the care, custody, control, or possession of a person registered with the Drug Enforcement Administration under section 302 of the Controlled Substances Act (21 U.S.C. 822) . . . if . . . the replacement cost of the material or compound to the registrant was not less than $500 . . . .

The parties agree that this statute on its face covers robberies that—like the Ferndale Pharmacy robbery—are intrastate, or "purely local" activities.

The inclusion of intrastate robberies of controlled substances in section 2118(a)(1) was within Congress's authority under the Commerce Clause. The theft of controlled substances is an economic activity for the same reason that the *McHenry* court recognized that carjacking is an economic activity: the thief makes an economic gain and the victim sustains an economic loss. *See McHenry*, 97 F.3d at 127. And Congress had a rational basis to believe that the theft of controlled substances, considered in the aggregate, would have a substantial effect on interstate commerce. This rational basis is particularly evident because section 2118 is part of a comprehensive federal regulatory scheme addressing the manufacture, distribution, dispensing, or possession of controlled substances. The Supreme Court recognized in *Raich* that Congress had set up a scheme to regulate the "established, . . . lucrative, interstate market" in controlled substances. 545 U.S. at 26. The statute at issue was the Comprehensive Drug Abuse Prevention and Control Act of 1970. Section 2118 originates from a later statute, the Controlled Substance Registrant Protection Act of 1984, but it is no less part of Congress's comprehensive regulatory

scheme over controlled substances. The statute criminalizes the taking of "controlled substances," defined as in the 1970 Act, from those who are registered with the DEA under the 1970 Act. *See* 18 U.S.C § 2118(a), (e)(1). The congressional record for the 1984 Act explains:

> The effective regulation of the commerce in controlled substances has resulted in very high prices for the drugs on the black market. As a consequence, theft of controlled substances from registrants has become a common yet serious problem. Although burglary and robbery of controlled substance registrants declined in 1982, it has been extremely serious, with between 5,000 and 6,000 such crimes annually between 1977 and 1981. The frequency of these crimes has terrorized the community of dispensing pharmacists. Some pharmacists have ceased to carry drugs that are highly desired on the black market, although this interferes with their patients' ability to obtain necessary medicine. This has a serious potential to impede the delivery of health care in many communities around the nation.

H.R. Rep. No. 98-644, at 2–3 (1984).

This demonstrates that section 2118 is undoubtedly part of the comprehensive scheme that Congress established to regulate the interstate flow of controlled substances. *See also United States v. Workman*, 990 F. Supp. 473, 473–75 (S.D. W.Va. 1998) (quoting the same text from the congressional record and concluding that section 2118 "was seen as an important adjunct in congressional attempts to regulate controlled substances").[4] In essence, the scheme could be undercut absent the protection of registrants from intrastate burglaries, robberies, and the resulting trauma. There is clearly, therefore, a rational basis for concluding that these prohibited activities would have a substantial effect, when aggregated, on interstate commerce.

---

[4] *Workman* rejected a Commerce Clause challenge to section 2118, as did *United States v. Potter*, No. 3:09-CR-138, 2010 WL 2813356 (E.D. Tenn. July 14, 2010). The government also cites another case that upheld section 2118 in light of a Commerce Clause challenge, *United States v. Sours*, No. 98-5072, 1999 WL 241839 (10th Cir. Apr. 23, 1999) . But, as Crowe correctly notes, the *Sours* court's inquiry was meaningfully different from the question here because an alternative jurisdictional portion of the statute was satisfied: "the person who engaged in [the taking of controlled substances] traveled in interstate or foreign commerce or used any facility in interstate or foreign commerce to facilitate such taking or attempt." *See* 18 U.S.C. § 2118(a)(2). That provision is not at issue here. Instead, jurisdiction here is premised on the fact that "the replacement cost of the [stolen drugs] was not less than $500." *Id.* § 2118(a)(1). The *Sours* court explicitly avoided "address[ing] whether the Commerce Clause permits Congress to criminalize robbery of a controlled substance when only the monetary element is satisfied." *Sours*, 1999 WL 241839, at *3 n.8.

Acts of violence and theft could rationally be seen to inhibit the flow and provision of federally regulated controlled substances. Congress had the authority to pass section 2118 under the Commerce Clause, and Crowe's as-applied constitutional challenge fails.

IV.

The first of Wingate's three claims on appeal is that his trial counsel's ineffectiveness violated Wingate's Sixth Amendment rights under *Strickland v. Washington*, 466 U.S. 668 (1984). Wingate alleges that two specific aspects of his lawyer's performance rendered the performance ineffective and prejudiced Wingate's defense. First, he focuses on his lawyer's failure to move to suppress a witness's identification of Wingate in a photographic lineup Second, he claims that his lawyer failed to subject the government's case to meaningful adversarial testing because he did not cross-examine many of the prosecution's witnesses testifying against Wingate.

To prevail on a Sixth Amendment ineffectiveness claim, a convicted defendant must satisfy two elements. First, he must show that his counsel's conduct fell below "an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 688. Second, the defendant must demonstrate prejudice by showing that "the decision reached would reasonably likely have been different absent the errors." *Id.* at 688, 696.

We do not generally review ineffective-assistance claims on direct appeal because, in most cases, such claims are better suited to adjudication in post-conviction proceedings. *Massaro v. United States*, 538 U.S. 500, 504 (2003) ("[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance."); *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012); *United States v. Bradley*, 400 F.3d 459, 461–62 (6th Cir. 2005). "'[W]hen an ineffective-assistance claim is brought on direct appeal,

appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus [the record is] often incomplete or inadequate for this purpose.'" *Ferguson*, 669 F.3d at 762 (alterations omitted) (quoting *Massaro*, 538 U.S. at 504–05). We make an exception only in the rare case in which the record is adequate to review the claim on direct appeal. *See United States v. Pruitt*, 156 F.3d 638, 646 (6th Cir. 1998).

Finding the record inadequate in the present case, we decline to resolve the issue at this stage. In particular, the record is not sufficiently developed to enable us to determine whether trial counsel's failure to cross-examine certain witnesses was an instance of deficient performance or the exercise of legitimate trial strategy. *See Massaro*, 538 U.S. at 505 (noting the need to develop a record to determine whether a lawyer's action "had a sound strategic motive or was taken because the counsel's alternatives were even worse"); *Strickland*, 466 U.S. at 689–90 (discussing the need for a criminal defendant to overcome the presumption that a challenged action reflected sound strategy). The record is also insufficient for us to determine whether the limited cross-examination and the failure to move for suppression of the identification testimony would likely have been different if counsel had proceeded differently. *See Massaro*, 538 U.S. at 505 ("Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial."). We therefore refrain from reviewing Wingate's ineffective-assistance claim and leave the claim to be resolved in post-conviction proceedings.

V.

Both defendants argue that we should reverse the district court's imposition of a seven-year sentence on Count Three (the conviction for using or carrying a firearm during the robbery

of Citizens Bank). Under 18 U.S.C. § 924(c)(1)(A), that offense carries a minimum seven-year sentence "if the firearm is brandished," but otherwise only a five-year minimum. The Sixth Amendment "permits only the jury, not the district judge, to make a finding on brandishing." *United States v. Mack*, 729 F.3d 594, 607 (6th Cir. 2013) (citing *Alleyne v. United States*, 133 S. Ct. 2151 (2013)). Here, the district court did not submit the brandishing element to the jury.

But because neither party objected, plain-error review applies. *See* Fed. R. Crim. P. 52(b); *Mack*, 729 F.3d at 607. We reverse based on plain error only if (1) the district court committed an error, (2) that is "plain," and (3) that affects the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). Here, the Government concedes that the district court's failure to submit the brandishing element to the jury "was error and that the error is plain," thus establishing the first two elements of plain-error review. Thus, the only remaining question is whether the error affected the defendants' substantial rights.

In general, this court applies an inquiry akin to ordinary harmless-error review to determine whether an error affected a defendant's substantial rights. *Mack*, 729 F.3d at 607.[5] Automatic reversal takes place only if the error falls within a narrow category of structural errors: "basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). But an error in instructing the jury on a crime's essential elements or issues that will increase his minimum sentence, such as the brandishing element here, is not a structural error requiring automatic

---

[5] Wingate argues that the court should reverse without considering whether the error was harmless. He points to a circuit split as to whether errors of this specific nature should be reviewed for harmlessness. *See United States v. Lara-Ruiz*, 721 F.3d 554, 558–60 (8th Cir. 2013) (reversing and remanding for resentencing without discussing harmless error); *United States v. Lake*, 530 F. App'x 831, 831–32 (10th Cir. 2013) (same). But in making this argument, Wingate implicitly concedes that the Sixth Circuit has noted the circuit split and decided to review for harmlessness. *See Mack*, 729 F.3d at 609.

reversal. *See Mack*, 729 F.3d at 608. The court must therefore ask "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 607–08 (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)). Applying this test in *Mack*, the court explained that the error would be harmless—and would not affect the defendant's substantial rights—"[i]f it is clear to us beyond a reasonable doubt that the outcome would not have been different even if the district court had instructed the jury on the element of brandishing and required the jury to make a finding on that element . . . ." 729 F.3d at 608. Based on the undisputed evidence in that case, the court was convinced that the outcome would not have been different: "if properly instructed, the jury would have found beyond a reasonable doubt . . . that the defendant brandished a firearm . . . ." *Id.* at 609.

In this case, Wingate is not entitled to relief because a properly instructed jury would have found beyond a reasonable doubt that both brandished a firearm during the robbery. The evidence overwhelmingly shows that the two perpetrators of the Citizens Bank robbery both brandished firearms. According to both the uncontroverted testimony and the bank surveillance video, the person identified as Wingate—the one seen jumping the counter—was pointing a gun. The same situation arose in *Mack*: the defendant disputed his involvement but not the issue of brandishing, the jury convicted him of the underlying robbery, and the undisputed evidence showed that the perpetrators brandished firearms. *Id.* at 608–09. The failure to submit the brandishing issue to the jury did not prejudice the defendant.

Wingate next argues that the court should also consider the possibility that a properly instructed jury would not have found brandishing beyond a reasonable doubt on the other two section 924(c) counts (Counts Five and Seven). Wingate notes that the rule of lenity applies to the district court's ordering of counts for sentencing purposes, requiring the district court to

consider the counts in the order that favors the defendant. *See United States v. Washington*, 714 F.3d 962, 971 (6th Cir. 2013). Here, regardless of the issue of brandishing, two of the section 924(c) convictions give rise to a mandatory twenty-five-year term of imprisonment. The brandishing issue therefore affected whether Wingate received a five-year or seven-year minimum sentence on his third section 924(c) conviction. Thus, ordering the convictions in Wingate's favor means that his minimum sentence on the remaining section 924(c) count would have been only five years if a properly instructed jury had failed to find brandishing on *any* of the three counts.

Although Wingate correctly analyzes the impact of the rule of lenity, he is not entitled to relief. The issues already discussed in relation to the Citizens Bank robbery apply with equal force to both the Medicap and the Ferndale robberies. There was significant and uncontroverted evidence that Wingate brandished a firearm in committing each robbery. One of the victims of the Medicap robbery testified that both robbers were pointing their weapons, a fact that the store surveillance video corroborates. One of the Ferndale victims testified that an assailant held her at gunpoint while demanding prescription drugs, and Wingate's fiancée identified Wingate as that assailant from the recording of the victim's 911 call during the encounter. As we noted above, Wingate's counsel also admitted to Wingate's role in the armed robbery of the Ferndale Pharmacy. As a result, it appears beyond a reasonable doubt that a properly instructed jury would have found that Wingate brandished a firearm in all three robberies. The district court's error was harmless.

Although Crowe did not develop this argument in his brief on appeal or at oral argument, he did submit a motion after oral argument, pursuant to Federal Rule of Appellate Procedure 28(i), to adopt the arguments that Wingate made on this point. We decline to grant Crowe's

motion. With respect to those counts, Crowe, who did not personally brandish a gun, was convicted under an aiding-and-abetting theory of liability. Wingate, on the other hand, was convicted as a principal. These theories of liability are substantially different from one another, and would require us to undertake a different form of legal analysis. We think that it is inappropriate for us to analyze an issue that has not been briefed by the parties and that was not discussed at oral argument. If Crowe wanted us to undertake an aiding-and-abetting harmless-error analysis with respect to his section 924(c) convictions, he should have properly raised the issue. *Hormel v. Helvering*, 312 U.S. 552, 556 (1941).

Although the district court committed an error that was plain in failing to submit the issue of brandishing, the error did not affect Wingate's substantial rights. We affirm.

VI.

The defendants' final argument is that the district court should not have imposed consecutive, enhanced sentences under 18 U.S.C. § 924(c) on Counts Three, Five, and Seven, each of which resulted in each defendant's conviction of using or carrying a firearm during a federal crime of violence.[6] The defendants argue that the imposition of these sentences—which totaled 535 months for Crowe and 684 months for Wingate—violated their Sixth Amendment rights to trial by jury pursuant to *Alleyne*, 133 S. Ct. 2151.

Section 924(c) provides: "[i]n the case of a second or subsequent conviction under this subsection, the person shall . . . be sentenced to a term of imprisonment of not less than 25 years," § 924(c)(1)(C)(i), and further mandates that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or

---

[6] Crowe's argument refers only to the sentences for Counts Three and Seven because he was acquitted of Count Five.

drug trafficking crime during which the firearm was used, carried, or possessed." *Id.* § 924(c)(1)(D)(ii).

The defendants concede that this court, in accordance with Supreme Court precedent, has previously upheld consecutive sentences when the "second or subsequent" convictions under section 924(c) derived from the same indictment. *See Deal v. United States*, 508 U.S. 129, 136 (1993); *Washington*, 714 F.3d at 970. The defendants argue, however, that these cases predate *Alleyne*, which held that if "a statute prescribes a *particular punishment* to be inflicted on those who commit it under special circumstances which it mentions, or with particular aggravations, then those special circumstances must be specified in the indictment." 133 S. Ct. at 2160 (internal quotation marks omitted).

But *Alleyne* explicitly reserved—based on the Court's prior decision in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998)—an exception "for the fact of a prior conviction." *Alleyne*, 133 S. Ct. at 2160 n.1. Thus, in the post-*Alleyne* case of *Mack*, we reiterated that "the Sixth Amendment does not require the government to set forth in the indictment and prove beyond a reasonable doubt the fact of a prior conviction." 729 F.3d at 609. This court therefore upheld consecutive twenty-five year sentences under section 924(c) for offenses charged in the same indictment. Precedent compels the same outcome here. The district court's imposition of consecutive, enhanced sentences under section 924(c) did not violate either defendant's Sixth Amendment rights.

## VII.

For the above reasons, we affirm both defendants' convictions and sentences.